No. 20,737.

ELIZABETH L. DeCROW et al., *Appellees,* v. JANE HARKNESS et al., *Appellants.*

SYLLABUS BY THE COURT.

1. WILL—*Delusion of Testator—Instruction.* An instruction touching delusion, of which there is no evidence except the preference shown by the will, criticized.

2. WILL — *Contest — Mental Incapacity — Discrimination Between Children—Instructions.* A charge that in deciding whether the testator was of sound mind when he made the will the jury might consider the reasonableness or unreasonableness of the manner in which he disposed of his property, and that if they believe that a man of sound mind would not have been likely to discriminate between children as he did in his will they might consider this with other circumstances in determining the question of his mental capacity, held error.

3. SAME. In the absence of a showing of metal incapacity or undue influence it is none of the jury's business what disposition the testator made of his property.

Appeal from Scott district court; ALBERT S. FOULKS, judge. Opinion filed March 10, 1917. Reversed.

*H. A. Russell,* of Scott City, for the appellants.

*L. S. Boyer,* of Scott City, and *C. M. Williams,* of Hutchinson, for the appellees.

The opinion of the court was delivered by

WEST, J.: James W. Harkness died January 28, 1914, at Colorado City, Colo., having made his will on the 17th. He was sixty-seven years of age and left as his heirs his widow, Jane Harkness; two sons, Charles E. and Claude; two daughters, Mary E. Peterson and Elizabeth L. DeCrow, children by a former wife; and Brannon H., a son by his widow, Jane Harkness; Myrtle Crozier, widow of a son, William R. Harkness by the former wife, and three grandchildren, the offspring of William R. For some time the testator had been in poor health. In 1913 he gave up his farm in Scott county, Kansas, and went to California, thence back to Colorado City where he bought property and settled down to pass his remaining years. He had some trouble with his kidneys for several months before his death. On January 2, he had a spell of nosebleed and called Dr. Gilmore. The doctor saw him again on the 4th, and on the 6th Mr. Harkness called at the office and settled the bill. On the 8th of January Dr. Fanning gave Mr. Harkness a prescription for nosebleed but made no examination. The former of these physicians gave it as his opinion that the testator was not able to transact ordinary business from the second day of January until his death. The latter, that he was thus disqualified from January 17. Certain other physicians testified theoretically to the usual effect of Bright's disease upon the mental condition of the patient. The daughter, Mrs. DeCrow, a school teacher, testified, among other things, that her father was in very poor health when he went to California in 1913; that he was "bloated like a stuffed toad, walking down the street." She next saw her father in August, 1913,

10—100 KAN.

at Colorado City, found him looking fine but troubled in mind. She knew this by things he would say and by the way he would do them. He met her at the train and had something to say about some controversy with his wife a short time before. She next saw him on the 18th of January, 1914.

"Of course he wasn't expecting me, but he had been looking for me the day before; so when I went in he threw up his hands, and said, 'Oh, my God,' and he went into a fit or something. . . . Well, as I said, he threw up his hands and his face contracted, and then he went to throwing up; and he wasn't in a condition to talk for at least half an hour. . . . Then he turned over and went to talking; and said he had given me up coming; that he thought I wasn't coming; and then he went and told me how sick he was."

She remained with him until the 28th, when he died.

"Q. Tell the jury how he talked. A. Well, his principal talk lay upon the fact that he was sick and was going to die. He wouldn't have been in bed, he said, but Dr. Gilmore came down there and treated him like a brute and done all sorts of things to him. He said he had given him some kind of medicine. And then he went on and told about this Dr. Fanning. He said he had given him poison and that was what put him where he was; if it hadn't been for him he wouldn't have been in bed, he said. He said that was what was the matter with him.

"Q. Now, how long were you with him after you arrived on the 18th? A. Until his death. I was with him all the time except at night.

"Q. How much of the time were you with him? A. Well, we kept turn about. My stepmother kept watch part of the time and I part of the time."

The witness further testified that from what she saw and the conversation with him, and from her own knowledge of her father, he was certainly not rational the day she arrived.

This suit was brought by Mrs. DeCrow and other heirs to set aside the will on the grounds of mental incapacity, and undue influence on the part of the wife. The latter testified that she not only did not influence him to make the will but tried to keep him from making one for fear it would make trouble with the children as she knew she would keep half of the property under the law. The jury found mental incapacity only. The defendants assign error in giving instructions eight and ten, in refusing defendants' first instruction, and in overruling their motion for a new trial.

J. D. Custer, a stone mason, testified that he was acquainted with Mr. Harkness about six months, saw him on the 11th,

DeCrow v. Harkness.

14th, 21st and 23d of January, 1914, and at that time his actions were not in all respects that of a man of ordinary intelligence; that Mr. Harkness was not right when he was suffering from his disease; "was rational sometimes and not right at other times." He did not see him on the 17th.

N. B. Wallace, seventy-three years old, deposed that Mr. Harkness lived in the house next door to him for about three months, told him what property he had, that he wanted to buy a home for himself and wife, and expected to live there and educate his little boy, and expected the balance to go to his children. He seemed out of his mind at times and at other times not. Conversations indicated a very sensible condition of mind and the witness did not know that he was not at all times competent to transact ordinary business such as he had to transact.

Charles Harkness, a son, testified that he saw his father after he went to California the latter part of September of that year, and he looked in better health than when he went, but could not stand to walk much, seemed to be bloated. "His mind seemed to be fairly well, although he asked the witness to advise him in some business matters."

L. S. Boyer testified that he was well acquainted with Mr. Harkness, had looked after his business for a number of years. Mr. Harkness was poor when he came to the county, but accumulated about four quarters of land and a considerable number of cattle, and some horses, and seemed to be in comfortable circumstances. He had a talk with him in September, 1913, about the disposition of his property, talked a good deal about his property in 1902 and 1903. In September, 1913, he said he didn't intend to make a will.

The testimony on behalf of defendants requires somewhat extended notice. Mr. Hilligoss, fifty-nine years of age, real estate agent of Colorado City, was acquainted with testator about a year, had some business relations with him, called on him every day up to his death. "Harkness was capable of transacting ordinary business up to his last illness."

Mr. Adams knew Harkness about six months prior to his death, met him every few days, walked with him from church, met him at the "checker game," called on him at his last sickness. Said his capacity to transact business was as good

as anybody's as far as witness could judge by his conversation; this condition continued up to within a week of his death: he had his last talk with Harkness about a week before he died; his mental condition was good then. On the 17th of January, the day he made his will, he was confined to his room, and his mind was as good as it ever had been.

Mrs. Hilligoss, a nurse, was acquainted with the testator from late in the spring of 1913 until his death, lived close, visited at the house many times during his last illness; was at the house the day Mr. Harkness made his will, both before and after he made it; had a conversation with him relative to the will both before he made it, in the morning, and after he made it in the evening of the same day. Mr. Harkness told witnesses he was "all ready to go with the exception of one thing and that is my will." After he made the will the witness called in and greeted Mr. Harkness with "How are you?" He said, "I am ready to go or I am ready to stay, I have made my will." He told witness he left his property to Mrs. Harkness and the boy. After this, witness was in once or twice a day. Asked as to his mental condition she answered: "Well, I should say, yes. If he should have deeded his property to me I should not have questioned it a minute." In one conversation Mr. Harkness told her of the neglect of him by his children when he had been sick, that he wanted the boy Brannon raised on part he had given him.

Dr. Wolf, sixty-one years of age, was acquainted with Mr. Harkness, met him and treated him a number of times up to the first of January, 1914. He was at all times in perfect mental condition; observed his mental condition and universally found him a keen, clear-headed business man; he was at all times in perfect mental condition; he had kidney and bladder trouble. Witness testified that there was nothing about the disease or ailment that would necessarily or seriously impair his mental capacity.

George Stuntz, pastor of the Methodist Episcopal Church, Colorado City, saw Mr. Harkness as often as one would see an acquaintance who seemed to be well and who lived in another part of the city. Saw him frequently during his last sickness, saw him every day from the 17th of January until he was taken to the hospital; conversed with him frequently; "Hark-

ness always conversed in a rational manner." He was rational at all times when he saw him except the last time, which was two or three days before he died, when he, the witness, didn't think he was entirely rational.

Louisa Adams knew the testator six months before his death; saw him frequently before his last illness; the last week before he was taken to the hospital she saw him every day; heard him talk to others; his conversations were rational; when she was with him his mind seemed clear; did not see him on the 17th but did see him two or three days afterward; he was rational.

Phillip Bouchey lived next door. Was called in to witness Mr. Harkness' will; had known him six months; talked to him every day, sometimes two or three times a day; will was executed January 17, 1914; Harkness sat up in a chair to sign the will; it was read over to him; to the best of witness' judgment Harkness was of sound mind when he executed the will. The will was read to Mr. Harkness by Mr. Rickards; that Harkness called his attention to a mistake in his name; and had it changed and then said it was all right.

Addie Bouchey also witnessed the will. She saw Mr. Harkness most every day, talked to him and heard him talk to others; he talked in a rational manner; was present to witness the execution of the will, January 17, 1914; Mr. Harkness was sitting up in a chair; in the best judgment of the witness he was of sound mind and memory when he executed the will. Witness was with him about half an hour at the time the will was executed.

J. N. Rickards of Colorado City, practicing attorney, was called on the 17th to draw his will. From his various conversation with Harkness and two he had with him the day before he drew the will, Mr. Harkness' mind was perfectly clear so far as he was able to discern and thought it was. He called at Harkness' house twice the day he drew the will, about half an hour the first time and probably ten minutes the last time.

Mrs. Hollister, stepdaughter, arrived January 21, 1914, and remained until his death and said the condition of his mind was good; just as good as it ever was.

Chauncey Harris formerly lived in Scott county, Kansas, and had known Mr. Harkness many years. Saw him fre-

quently after he moved to Colorado City, and saw him about every day in his last illness; was present and witnessed his will; his mental condition on the day he made his will was as good as it ever was. Harkness had told him at one time after he moved to Colorado that when his first wife died his children wanted him to divide up his property, and Charlie told him it was the law to divide up, and he told him that he wouldn't do it. The day the will was executed the witness was called to the house about six o'clock in the morning. Mr. Harkness said, "Harris, I am a very sick man. I believe I had better make my will." On being assured that he wasn't going to die he said, "Well, I am awful sick." So witness said he tried to cheer him up and make him think he was not so sick as he thought he was; that was the day before he made his will. "I told him I would get a lawyer if I could find one in town. I found Mr. Rickards and asked him." On January 16, Mrs. Harkness, in a converation with the witness, said she didn't want her husband to make a will but that he wanted to do it. Witness was present when Mr. Rickards made the draft of the will. "That Mr. Harkness dictated the contents without memoranda; even describing his lands; witness was present when the will was signed; Harkness was sitting up in a rocking chair."

Other witnesses testified as to expressions of Mr. Harkness as to the way he had been treated by his children and of his determination that they should not have the property.

Leaving out formal parts, the will, executed January 17, was as follows:

"After the payment of all of my just debts and funeral expenses, I give and bequeath to my son, Charles H. Harkness, the sum of Five Dollars. To my daughter, Mary E. Peterson, Five Dollars. To my son, Claude Harkness, the sum of Five Dollars. And to the direct heirs of my deceased son, Will Harkness, Five Dollars. And to my daughter, Bessie DeCrow, Five Dollars.

"I give, devise and bequeath all my property of every kind, and nature, real and personal or mixed, to my beloved wife, Jane Harkness, and to my beloved son, Brannon B. Harkness, who is also a son of Jane Harkness, share and share alike, provided, however, should my son Brannon B. Harkness survive his mother, Jane Harkness, then it is my will that he shall take all of the property going to my wife, Jane Harkness.

"I do hereby nominate and appoint Homer Rector, Executor of this my last will and testament, hereby authorizing him to adjust release and

DeCrow v. Harkness.

discharge as he may deem best, the debts and claims due me. I also authorize my Executor, if it shall become necessary, to dispose of any of my real estate that he may sell on such terms as may seem best to him, not to exceed one half of my real property situate in Scott County, Kansas, and to execute and acknowledge deeds in due form therefor. Homer Rector resides in Scott Co., Kansas.

"I do hereby revoke all former wills by me made.

"In testimony whereof I have hereunto set my hand and seal this 17th day of January, 1914.

his<br>JAMES W. ✕ HARKNESS."<br>mark

It can not escape notice that this will bears facial indications of having been dictated by one in full possession of his faculties.

"It is a rule of law because it is a rule of common experience that a creation of the mind may be of such a character and may occur under such circumstances that it proves the sanity of the creative act." (*Wisner v. Chandler,* 95 Kan. 36, 60, 147 Pac. 849.)

The defendants requested the following instruction, which was refused:

"Evidence that a testator was afflicted with Bright's disease and diabetes, and that such affliction affected his mind before the will was made, and his mental condition continued to grow worse until his death is not conclusive proof of incapacity to make a will; but you are instructed that if the evidence establishes the fact that the will under consideration in this cause was a product of James W. Harkness' unaided and uninfluenced mind at the time it was made and that he understood its contents and so wished to dispose of his property, you must find for the defendants and uphold the will, regardless of testimony that a person so affected would be incapable of attending to, and transacting ordinary business."

The court's instruction numbered V½ was substantially the same as the one requested and refused, except it omitted the expression "regardless of testimony that a person so affected would be incapable of attending to, and transacting ordinary business." But this omission did not render the refusal of the requested instruction erroneous.

In instructions 8 and 10, complained of by the defendants, the jury were told (8) that a person to be incapacitated to make a will "need not be insane or incapable of understanding ordinary business transactions. The testator may be capable of transacting ordinary business affairs of life and sane on other matters, but if the will was influenced and the direct offspring of an unfounded and insane delusion it can not be sustained, and

in this case, although you may believe from the evidence that James W. Harkness was capable of transacting the ordinary business affairs of life, at or about the time he executed said will, yet if you also believe that at the time of the making of said will in controversy he was influenced in making said will and that the provisions in said will, cutting off the children by his first wife substantially from any of his property, was the offspring of an unfounded and insane delusion without the slightest pretense or color of truth, that his children of his first wife were unkind to him or mistreated him, then the will can not stand and your verdict will be for the plaintiff."

Instruction No. 10 was:

"In weighing the testimony in this case the jury are not confined in their consideration to the positive testimony of witnesses, but shall consider every fact which may be established by circumstantial evidence, if in their judgment any fact is established by circumstantial evidence, and if in the mind of the jury a fact in connection with this case has been clearly established by circumstantial evidence, the jury may accept such evidence of such fact, although opposed by direct and positive testimony of witnesses, although they are not bound to do so."

The obvious purpose of these instructions was to advise the jury that although the testator may have been mentally capable in other respects, if they should find from the evidence, circumstantial or otherwise, that he had an insane delusion that his children had not treated him kindly, which delusion caused him to make the will as he did, it could not stand. A similar instruction was upheld in *Medill v. Snyder,* 61 Kan. 15, 68 Pac. 962. It was there remarked, however, that as the court made its own findings of fact from the evidence the instruction was not of great consequence. In *Harbison v. Beets,* 84 Kan. 11, 113 Pac. 423, in discussing the insane delusion there found to exist it was said:

"He knew what he was doing, but he had an insane reason for doing it. This is really not more mysterious than other manifestations of insanity, for its effects are often inconsistent and inscrutable." (p. 18.)

In *Wisner v. Chandler,* 95 Kan. 36, 147 Pac. 849, speaking of a notion entertained by the testator, it was said:

"It was not a figment of the testator's imagination. It was not a delusion springing from a mind disordered by disease. It had a solid basis in reality. However much it may be regretted that the testator could not forgive, as Mrs. Wisner probably did, his resentment was

human and natural, and if he magnified his injury and illogically and unjustly carried his resulting prejudice too far, so that it extended to the family over which Charles presided, he was not possessed of an insane delusion within the purview of any well-considered decision of which this court is aware." (p. 50.)

A careful examination of the entire record discloses some reason for Mr. Harkness' feeling that his children had not treated him as a parent deserves or as he might expect from his own flesh and blood who lived within reach and failed to call on him in time of sickness. Also that there had been some discussion and irritation over his failure to divide up the property when his first wife died. While the language of the eighth instruction may state a correct principle of law, the difficulty is in finding its application to the facts herein shown.

The son Charles testified that his brothers Claude and Will and his youngest sister, Mrs. DeCrow, remained with the father a part of the time after his marriage; that the relations were always pleasant between his father and himself as well as his brothers and sisters; that he never knew of any "serious difficulty between his father and any of the children." After seeing his father in September of the year he went to California he never again saw him alive. "Did not know he was sick until they brought him home a corpse."

Reverend Mr. Stuntz testified that "Mr. Harkness had told him of some trouble he had had with his son at a public gathering."

Chauncey Harris testified that—

"Harkness had told him at one time after he moved to Colorado that when his first wife died, his children wanted him to divide up his property and Charlie told him it was the law to divide up and he told him that he wouldn't do it. In the meantime, he said, whenever he had a new colt he would always give it to one of the children, and told them they could claim that colt; and at this time they all got mad and each of them took their horses and left him one old horse and left him alone."

John Hollister testified that just after the loss of his first wife Mr. Harkness told him that he "had to divide up his property with the children, and he didn't seem to like it; he thought by dividing up little would be left for him; I tried to convince him he didn't have to; we talked for about two miles and as I left him he says, 'John, if I don't have to divide my property, they shan't have a bit of it.' I could n't get it into my

head that the children would want him to divide the property, and I asked him if Charlie said he had to divide his property at this time and he said, 'Yes.' " George Crofton testified that he and Charles Lamb took care of Mr. Harkness for nearly two weeks when he was sick while a widower, that the children did not come near and did nothing for him; "he was pretty sick, and he just had the care we gave him." While some of these statements of the testator were denied, they still remain as portions of the evidence. Mrs. DeCrow admitted that she went to the lawyer who drew the will and asked him if he thought a man who could make that sort of a will could be in his right mind.

The petition nowhere charges any insane delusion. It charges mental inability and imbecility arising from disease and worry, and charges the active influence of the second wife to induce him to devise and bequeath all his property to her and the minor son, of which there was no syllable of testimony, but there is no charge of any unfounded or insane delusion as to the way his children had treated him. The tenth instruction is another correct statement of an abstract proposition of law of very doubtful application to the facts of this case. But it can hardly be said that it amounted to affirmative prejudicial error.

The second instruction given by the trial court was as follows:

"The Court instructs the jury that in deciding whether or not James W. Harkness was of sound mind at the time of making the will in controversy you have a right to take into consideration the reasonableness or unreasonableness of the manner in which he disposed of his property, as a circumstance to be considered with all the other circumstances in the case; and if you believe that a man of sound mind would not have been likely to have discriminated against the children of his first wife in favor of a child of his then present wife, then you have a right to consider this circumstance in connection with all the other circumstances in the case in determining whether or not James W. Harkness had the mental capacity to execute the will in question."

This was doubtless taken from or suggested by an instruction considered in *Howard v. Carter*, 71 Kan. 85, 93, 80 Pac. 61, in reference to the alleged mental soundness of the grantor in certain deeds involved in that case. But in *Blodgett v.*

*Yocum,* 80 Kan. 644, 103 Pac. 128, somewhat similar language was used in charging the jury, and this court said:

"This instruction was erroneous. It practically told the jury that if they regarded the disposition which the deceased made of her property as unreasonable they might infer that at the time she executed the deeds she was of unsound mind or unduly influenced, or both. . . . A person of sound mind who is not unduly influenced may make such disposition of his property by deed or will as he desires, without regard to its fairness or unfairness. He may give to one child the bulk of his property and cut the other off with a shilling." (pp. 646, 647.)

This was followed by *Coblentz v. Putifer,* 81 Kan. 905, 106 Pac. 1011, reversing the judgment on the authority of *Blodgett v. Yocum.* In *Coblentz v. Putifer,* 87 Kan. 719, 125 Pac. 30, it was said:

"While the instruction given was not as broad as the one in the Blodgett case, it did nevertheless without defining reasonableness authorize the jury to decide for themselves the reasonableness of the contract and use their own judgment thereon as a basis for setting it aside. It will not do to say that a person of sound mind may make any sort of conveyance he desires, but that if he makes a conveyance which appears to the jury unreasonable they may infer therefrom that he was of unsound mind, or unduly influenced. Such a rule would put wills and conveyances not within the control of the person who had accumulated the property but within the control of strangers whose experiences and ideas might differ widely from those of the person who had exercised the *jus disponendi."* (p. 726.)

In the Wisner case it was said:

"The right to make a will is given in order that the devolution of property under the statute of descents and distributions may be cut off according to the testator's own will. The law does not require that a will shall be natural or reasonable or sensible or kind. The popular notion of the testamentary right does not accord with the legal notion. It is the duty of the courts and of the legal profession to follow the law." (95 Kan. 66.)

The defendants' last assignment of error was in overruling the motion for a new trial, one ground of which motion was "error of court in instructions given to jury," so that the matter is properly before us for consideration.

We have given more space to the recital of evidence in this case than is usual in order that the real situation may be disclosed. While no serious rupture appears to have occurred between Mr. Harkness and his children by his first wife, still

there was evident dissatisfaction on the part of some of them at least that he did not divide up his property with them, and there was evidence indicating failure on their part to show him the attention he might well expect in time of sickness. No trouble appears to have arisen between the children and their stepmother, and it was but natural that as the former had become mature and doubtless able to take care of themselves he should desire the bulk of his property to go to his second yokefellow and their child, whose lack of robust health made him a peculiar object of solicitude.

Amidst all the theories of all the schools of social economics practical people have not yet gone beyond the fundamental theory of the real ownership of property and the right to dispose thereof as the owner sees fit. After a man has by a lifetime of effort and economy accumulated a competency it is for him and not for some jury of strangers to say in what manner he shall dispose of it among his heirs and devisees. Neither is it the duty of the latter to explain to a jury why the testator saw fit to divide it one way rather than in another. It is none of the jurors' business. It is for them and for the court, in the absence of mental incapacity or undue influence, to respect the wishes of the testator in regard to his own property and its disposition when the summons comes for him to join the innumerable caravan.

While the courts of other states and numerous text-writers seem to accord much more leeway to jurors and much less power of disposition to owners of property this court is on record for giving proper respect to the desires of a qualified testator. It is impossible to read the abstracts without the conviction that the principle to which this court is committed was departed from by instruction No. 2 and that the danger line was approached if not reached in instruction No. 8. The evidence that at the time the will was executed the testator was possessed of sufficient testamentary capacity is convincing if not overwhelming. In this condition of affairs courts have no right to disregard the will and wishes so clearly drawn and expressed, and for the reasons indicated the judgment is reversed, and the cause remanded for further proceedings in accordance herewith.