## No. 31,018.

ROY F. KLOSE, WILLIAM KLOSE, MARY E. GEUYER, MARGARET N. BENNER, JOHN B. LAHR, W. CAMERON LAHR and MARY H. TRITT, *Appellants,* v. ARTHUR J. COLLINS and GLEN R. SEWELL, as Individuals and as Executors of the Alleged and Pretended Will of Hattie Weary, Deceased, and THE NATIONAL BANK OF SABETHA, *Appellees.*

(20 P. 2d 494.)

Opinion filed
April 8, 1933.

*James L. Haley,* of Sabetha, and *Harry A. Lanning,* of Seneca, for the appellants.

*Clifford W. Baldwin,* of Seneca, *Bennett R. Wheeler, S. M. Brewster, John L. Hunt* and *Margaret McGurnaghan,* all of Topeka, for the appellees.

The opinion of the court was delivered by

HUTCHISON, J.: This appeal is by the plaintiffs from an order of the trial court sustaining the demurrer of the defendants to the evidence of the plaintiffs and rendering judgment for defendants for costs in an action to set aside a will.

There are six assignments of error, but only the fifth and sixth are stressed, and they are as follows: "The findings and judgment of the court is contrary to the law and evidence in said cause," and "The court erred in sustaining defendants' demurrer to the evidence."

A preliminary question is also urged that the burden of proof should be on the defendants to establish a *prima facie* case that the will was duly and legally executed and that it had been properly and legally probated. In connection with this question of burden of proof the plaintiffs moved the court for judgment on the pleadings and opening statements because of the failure of defendants to make out a *prima facie* case as to the execution and probate of the will. The trial court overruled this motion and placed the burden upon the plaintiffs. We find no error in these rulings because, while the petition attacks the validity of the will in many ways, yet it alleged its execution and admission to probate, and the answer specifically admitted both these allegations.

The grounds upon which plaintiffs seek to set aside the will are the mental incompetency of the testatrix, undue influence and want of independent advice.

The will in question was executed August 4, 1931, by Mrs. Hattie Weary, a widow seventy-eight years of age, who died on the first day of December following. The plaintiffs are seven nieces and nephews of the testatrix, who are residents of the states of New York and Pennsylvania. They are all children of half brothers and half sisters of the testatrix. The defendants are Arthur J. Collins and Glen R.

Sewell, as individuals and as executors of the estate. They were the president and cashier, respectively, of the National Bank of Sabetha, located at Sabetha, Kan., which was the place of their residence as well as that of the testatrix. After making provision for the payment of debts and funeral expenses the will bequeaths all the rest, residue and remainder of her property—

". . . unto my two trusted friends, Arthur J. Collins and Glen R. Sewell, both of Sabetha, Kan., the same to be divided between them share and share alike. And in case either of the said Arthur J. Collins or the said Glen R. Sewell, or both of them, should precede me in death, then it is my will that the share of my property which would have gone to him or them, if living, under the terms hereof, shall go to and be vested in his or their heirs, devisees or legatees, as by law or by will provided, to the same effect as if he or they had taken the same while living. My residuary devisees and legatees above named are not related to me by blood or marriage, but inasmuch as I have no descendants or near relatives to whom I can leave my property, I make these provisions in their favor as my tried and true friends, and in grateful recognition of their helpful interest in and true service to me."

These two beneficiaries were nominated as executors without bond, and were appointed by the probate court and qualified as such.

On the question of mental incompetency, a number of witnesses testified, giving it as their opinion that she was not mentally competent to make a will after the month of June, 1931, at which time she had been sick for about two weeks, but most of such witnesses stated that they base such conclusion upon her weak physical and mental condition and the fact that she was very childish, very forgetful, had a very poor memory and repeated statements, that she did not transact any business for herself, that she had told several of them that Mr. Sewell looked after all her business. One witness related an instance of soliciting her to duplicate the $65 contribution given by the ladies of the church to repair the parsonage, and she answered she would have to see Mr. Sewell first. She later told the witness that she would give $25, and that the witness might go to the bank and get it. She, the witness, went and got it. Another incident was about a donation to the Baptist church. She said that she was going to give $10, but that Mr. Sewell said she could give $25.

Two other witnesses testified concerning the building of her large dwelling house several years before her death, and that she did not

go around the building to give directions, but Mr. Sewell was there very often. After she moved into the nicely furnished new home she was unable to tell the cost of some of the articles of furniture.

Two others related the incident of ladies looking at hats in a store, when one suggested to her the appropriateness of a certain hat for her, and she said she would have to go to the bank to see if she had enough money for it. She told many people that Messrs. Collins and Sewell did all her business. One said she was of a talkative, juvenile nature. She talked mostly about common things. She was fond of going. Would telephone and ask parties to take her with them on drives. Had neighbors and friends take her to church regularly. Was there the Sunday before her death. She was crippled in her lower limbs with rheumatism, and it was difficult for her to walk alone and more difficult to get in or out of a car. After arranging by telephone for neighbors to take her somewhere, she would later telephone them about it. Was always ready to go when they called for her.

Her husband, who died seven years earlier than she, was a business man, and she never during their married life had to look after any business. These two defendants settled his estate and continued to look after her business and property. She telephoned the bank when she wanted a bill paid, and regularly recurring bills were paid by Mr. Sewell's writing and signing checks therefor on her account at the bank. When she went to the bank on business, checks would be written for her and she would sign her name to them. She had a maid in her home, procured for her by Mr. Sewell. Mr. Sewell made out her tax statements and generally looked after her business affairs.

She knew about her relatives in New York and Pennsylvania and talked about them often, especially with one who had recently visited some of them back east. She talked to some of her neighbors, after her sister died, about having made a will in which she tried to make a distribution of her property among relatives of her husband as well as her own. She told Mr. Baldwin, who wrote the will, that she had no children or descendants of children, that she had some distant relatives in the east, but they were not very close relatives and didn't mean much to her and she wanted her property to go to those who had helped her.

It was said in the case of *Barnhill v. Miller,* 114 Kan. 73, 217

Pac. 274, that "to be counted by people as bright and brilliant enough to manage things" was not the test of testamentary capacity. This testator was shown to not recognize all the time the people he knew, that he omitted phrases in his talk, and his conversation was not connected and it was difficult to understand him.

"In order to possess the mental capacity to make a valid will, the law, based upon the experience of mankind and common sense, does not require that the testator possess the ability to manage or carry on a complicated business enterprise. If he possesses the mental capacity to know what property he has, and is able to make a disposition of his property with understanding and reason, knows the persons and objects of his bounty, and their condition and relationship to himself, and is able to dictate the items of the will himself, this is sufficient." (*Higbee v. Bloom,* 108 Kan. 723, 733, 196 Pac. 1080.)

"The definition next in order of brevity is to the effect that where the testator knows his estate, the object of his affections, and to whom he wishes to give his property and understands the business in which he is engaged, he has sufficient capacity to make a will." (28 R. C. L. 86.)

The mental condition of the testatrix in the case at bar was very much better and superior to that described in the case of *Goode v. Cummings,* 115 Kan. 516, 223 Pac. 317, where the will was upheld after being seriously attacked on the ground of mental incapacity.

"The settled rule in this state is that one who is able to understand what property he has and how he wants it to go at his death, is competent to make a will even though he may be feeble in mind and decrepit in body." (*Cole v. Drum,* 109 Kan. 148, syl. ¶ 6, 197 Pac. 1105. See, also, *Rishel v. McPherson County,* 122 Kan. 741, 253 Pac. 586; *Hoff v. Hoff,* 106 Kan. 542, 189 Pac. 613; and *Wisner v. Chandler,* 95 Kan. 36, 147 Pac. 849.)

We conclude that the showing of mental incapacity was not sufficient under all the facts and circumstances to require the setting aside of the will on that account.

There was no evidence as to undue influence except that which it is claimed can be properly inferred from the fact that these two beneficiaries, and especially one of them, Mr. Sewell, looked after the business affairs of the testatrix for the seven years she lived after her husband's death, but there was nothing to show that they occupied a fiduciary relation with her. She was shown to have frequently asked advice of Mr. Sewell about business matters. She wanted her friends and relatives who visited her to meet these two friends. She manifested a strong inclination to follow Mr. Sewell's suggestions as to certain expenditures. Advising as to religious or charitable contributions, the purchase of a hat and furniture, en-

gaging the services of a hired girl, and even looking after the building of the new dwelling, would not require or imply any confidential relationship.

An opportunity, of course, existed on their part to influence her greatly if they had so desired. The human and natural desire for gain and wealth must be conceded as normal and ordinarily existing. But human desire, motive and opportunity to exercise such influence will not alone authorize the inference that undue influence was in fact exercised. Neither will suspicion or the possibility of their having induced the making of the will favorable to them be enough to justify a finding of undue influence. (*Ginter v. Ginter*, 79 Kan. 721, 101 Pac. 634.)

"The mere existence of confidential relations between a testator and a beneficiary under his will does not raise a presumption that the beneficiary has exercised undue influence over the testator and does not cast upon the beneficiary the burden of disproving undue influence. Those consequences follow only when the beneficiary has been actively concerned in some way with the preparation or execution of the will." (*Ginter v. Ginter*, 79 Kan. 722, syl. ¶ 8, 101 Pac. 634.)

"To destroy the validity of a will undue influence must amount to coercion, compulsion or constraint which destroys the testator's free agency and by overcoming his power of resistance obliges him to adopt the will of another instead of exercising his own. . . ." (*Ginter v. Ginter*, supra, syl. ¶ 1.)

It was said in *Colvin v. Colvin*, 128 Kan. 691, 280 Pac. 763:

"It is correctly argued by the appellant that there is no presumption of the exercise of undue influence, even when a fiduciary relation exists as in this case, when the evidence affirmatively shows that she had independent counsel to advise her. On the other hand, the presumption is in favor of the validity of the will when it has been regularly admitted to probate in the proper court, as this will was admitted. So there is no question in this case as to any presumption being in favor of the plaintiffs, but, in fact, the presumption is against them and the burden of proof is upon them to establish by a preponderance of the evidence that there was in fact undue influence exercised over the mother by the son in the execution of the will." (p. 696.)

It was held in *Carlisle v. Baker*, 123 Kan. 415, 256 Pac. 141:

"In a suit to set aside a will because of the alleged mental incapacity of the testator, and of the undue influence of the principal beneficiary, it is not error for the court to sustain a demurrer to plaintiffs' evidence when such evidence, and all reasonable inferences to be drawn therefrom, considered most favorably to plaintiffs, fail to show such mental incapacity and fail to show any undue influence relating to the execution of such will." (Syl. ¶ 2. See, also, *Bell v. Skinner*, 119 Kan. 286, 239 Pac. 965; and *Rishel v. McPherson County*, 122 Kan. 741, 253 Pac. 586.)

There is no evidence here to indicate that the business relationship these two defendants had with the testatrix ever reached the state of being such as might properly be termed confidential, nor the influence they may have had with her or over her being unduly used, in the making of the will or in other matters.

Appellant insists that the will is invalid because it was written and prepared by the sole or principal beneficiary who was the confidential agent of the testatrix without the benefit of independent advice, claiming that Mr. Baldwin, the attorney who prepared and wrote the will, was in the employ of the defendants, both individually and as officers of the bank, and, therefore, his work and advice was that of the defendants and for and in behalf of them. The evidence does not show just how or by whom Mr. Baldwin was requested to come to Sabetha and write the will of Mrs. Weary. It shows that when he reached Sabetha he went to the bank and Mr. Sewell took him to the home of Mrs. Weary and introduced them. Sewell then left the room and she and the attorney conferred at length. He went back to the bank with Mr. Sewell and there wrote the will himself on a typewriter in the bank, and Mr. Sewell drove him back to the home of the testatrix where the will was executed. Among other things concerning this matter Mr. Baldwin testified:

"At the time we were leaving her house after the will had been drawn and executed and just as Mr. Sewell and I were leaving, she placed her arm on his arm and said, 'Now, you be sure to remember to pay Mr. Baldwin for this.' Mr. Sewell was not in the room where the will was drawn at the time I drew the will. He was not there when I talked it over with Mrs. Weary. Just Mrs. Weary and myself. I first talked it over with Mrs. Weary. I had a portable typewriter there but it would not work. I got the information as to what should go into the will from Mrs. Weary. Mr. Sewell was not present. He was not in the room. He made no suggestion to me at any time as to what I should put in the will. I advised with her and she with me about this will."

Many questions were asked him about his employment as attorney for the defendants and the bank, and the answers show he was not regularly retained by them or the bank but had been employed by them in quite a number of cases and for the examination of abstracts, but did not have all of their legal business.

The statute about independent advice is as follows:

"*And provided further,* That in all actions to contest a will, if it shall appear that such will was written or prepared by the sole or principal beneficiary

in such will, who, at the time of writing or preparing the same, was the confidential agent or legal adviser of the testator, or who occupied at the time any other position of confidence or trust to such testator, such will shall not be held to be valid unless it shall be affirmatively shown that the testator had read or knew the contents of such will, and had independent advice with reference thereto." (R. S. 22-214.)

It may be very seriously questioned whether either of the defendants in this case could be regarded as the sole or principal beneficiary as they were to share equally in the estate. (*Kelty v. Burgess,* 84 Kan. 678, 115 Pac. 583.) But passing that point, the evidence fails to show that the will was either written or prepared by either of the beneficiaries and also fails to show that Mr. Baldwin was so under the control and supervision of them as to disqualify him as being able to give independent advice to the testatrix. This, together with the feature of the beneficiaries being confidential agents, as specified in the statute above quoted, which was adversely disposed of earlier in this opinion, makes the claim of the appellants as to the want of independent advice inapplicable to the facts in this case. (*Flintjer v. Rehm,* 120 Kan. 13, 241 Pac. 1087.)

We think the demurrer to the evidence was properly sustained. The judgment is affirmed.