No. 37,465

In the Matter of the Estate of ELDA A. WALTER, Deceased. A. S. FOULKS, Executor, JOHN WALTER, CLARA WALTER, EVA WALTER POOLE and FLOYD WALTER, Proponents, *Appellants*, v. BLANCHE McCRAY, Objector, *Appellee*.

(207 P. 2d 262)

Opinion filed July 9, 1949.

*Wayne Coulson,* of Wichita, argued the cause and *Howard T. Fleeson, Homer V. Gooing, Paul R. Kitch, Dale M. Stucky,* and *Donald R. Newkirk,* all of Wichita, were with him on the briefs for the appellants.

*George M. Ashford,* of Wichita, argued the cause and *Tom Smyth,* of Ness City, was with him on the briefs for the appellee.

The opinion of the court was delivered by

SMITH, J.: This is a proceeding commenced in the probate court for admission of a will to probate. Seven heirs at law of testatrix filed an objection on the ground that decedent at the time of the alleged execution of the will was not of sound mind and memory and on the further ground that the will had been obtained by undue influence practiced by the four devisees named in the will. Another heir filed a cross petition, in which she alleged that the deceased was in dire circumstances and that deceased told cross petitioner that if she would take her into her home and look after her she would give all her property to cross petitioner; that she agreed to the proposal and carried out her part of the contract to the letter and the deceased made a will giving her all her property and the will was given to a bank for safe keeping. The cross petition alleged that during the last days of 1943 deceased became deranged and mentally incompetent and left the home of cross petitioner, obtained the will from the bank, and cross petitioner was not able to tell what had been done with it. It was alleged that at the time the will was made deceased was capable of making a will and it was made of her own free will but that since she left cross petitioner's home she had not been of sound mind and was in no respect capable of making a will. The cross petitioner prayed that the will executed in 1941, giving her the property, be established as the last will of deceased and that if that could not be done the contract be enforced.

The probate court heard all these matters and found that the allegations of the petition to probate the will had been proved; that the decedent died testate on September 21, 1946, a resident of Ness county, Kansas, leaving an estate therein; that the instrument bearing the date of January 10, 1944, was duly executed; that at the time of the execution decedent was of sound mind and under no restraint and that the will was valid and genuine; that the will described in the cross petition was revoked and that the alternative relief for enforcement of a contract should be denied. It was also ordered that A. S. Foulks be appointed executor of the will of testa-

trix since he was named by the testatrix in the will. It was further ordered that deceased died intestate as to certain property, which property would be subject to administration; that it was for the best interest of the estate that Foulks be appointed administrator of the intestate property also.

From this order admitting the will to probate an heir other than any of the seven who had objected to its probation in the first place appealed to the district court.

For the purpose of clarity a statement of a general nature will be made.

At the time of the death of testatrix's husband in 1940 she was seized of two adjacent quarter sections of land in Lane county. Her husband was seized of two quarter sections contiguous to these but in Ness county. The Lane county land was very rough. The Ness county land was smooth and good farming land. The couple lived on the Ness county land. Testatrix's husband died testate and left all his property to his widow, testatrix here. By this she took the two Ness county quarters from her husband, and already owned the two Lane county quarters. By two different conveyances and under circumstances which will be noted later testatrix conveyed the two Lane county quarters to one Gregg.

The will offered for probate devised the two Ness county quarters to four nieces and nephews of deceased on her husband's side. Some months after the making of this will the testatrix was declared incompetent and a guardian appointed. This guardian sold one of the Ness county quarters and had the money received from the sale on deposit in the bank at the time these proceedings were begun.

At the same time her appeal was taken to the district court Blanche McCray filed a position in the district court entitled "Petition of Blanche McCray To Strike From Inventory." She alleged she was the heir of the decedent and further that Foulks, as executor of the estate of decedent, had filed an inventory of the estate and that inventory had included as money in the bank $6,140.69 of personal property; that the only property described in the will was the half section of Ness county land; that the will contained no residuary clause and made no disposition of any other property other than the above described property; that decedent died intestate as to the personal property described and that it should be ordered stricken from the inventory filed by the executor. Plaintiff prayed that the court order the personal property be stricken from the inventory

filed by Foulks as executor. This motion was denied. Shortly thereafter the proponents of the will moved to dismiss the appeal from the probate court on the ground that when Blanche McCray filed the motion, to which reference has just been made, she recognized and acquiesced in the validity of the order of the probate court of Ness county, Kansas, and in the fact that Foulks had been named executor of that will. This motion was overruled. At the conclusion of the testimony the court made extensive findings of fact. Following these findings of fact the court made conclusions of law, as follows:

"Conclusions of Law

"On January 10, 1944, or on the date Elda A. Walter made the will in controversy:

"1. She did not have mental capacity: A. To know and understand the nature, extent and value of her property; B. To comprehend the nature of the obligations she owed to her relatives.

"2. She was unable to make a disposition of her property with understanding and reason because of an insane delusion that her relatives had not been good to her and that she had received title to the Ness county land from her second husband."

A motion to set aside certain of these findings of fact and conclusions of law was filed by the proponents of the will. This also included a motion for a new trial on the ground that the decision was contrary to the evidence, judicial improprieties on the part of the court in discussing the case with witnesses outside of court and in receiving evidence from them not adduced from the witness stand and not included in the record; in discussing and arguing the case with witnesses, clerk, court reporter and counsel for objector with court not in session and in absence of counsel for proponents; that the evidence did not justify the conclusions of law.

In response to this motion the trial court filed amended findings of fact, which were about the same in substance as the original findings. Following this the court made a journal entry in which it referred to the amended findings of fact and conclusions of law, ordered that the will be refused probate; that deceased died intestate and that the property described in the instrument should pass under the laws of intestate succession.

The proponents have appealed and their assignments of error are that the court erred in overruling the motion of proponents to dismiss the appeal to Blanche McCray from the order of the probate court rendered on the 15th of February, 1947, admitting the will to

probate, in overruling the objection of proponents to questions asked certain witnesses and also overruling the motion of proponents to strike the same testimony and in overruling proponents' demurrer to objector's evidence, in discussing the case with witnesses outside of court and receiving evidence from them not adduced from the witness stand; that the findings of fact were not supported by and were contrary to the evidence; that the facts did not justify the conclusions of law; in denying probate of the will and in overruling proponents' motion for a new trial.

Proponents first argue their motion to dismiss the appeal should have been sustained on account of appellant's motion, to which reference has already been made, on the theory that she thereby acquiesced in the judgment of the probate court admitting the will to probate and appointing an executor. They cite many cases where we have held that acquiescence in a judgment precluded appellate review. Those cases are not in point here. The motion of the appellee did not constitute acquiescence. She simply stated that whether the will was good or bad she still was entitled to have her share of cash referred to as an heir. We are not called upon to decide the question of whether or.not her position was correct in that regard because the court overruled her motion, as well as the motion to dismiss, and she did not appeal since the final judgment was in her favor.

We next proceed to a discussion of the merits of this appeal.

One of the specifications of error is that the trial court erred in overruling the demurrer of proponents to the objector's evidence.

It should be noted that where the will is executed in compliance with the statutory requirements it is presumed to be a valid will. (See *In re Estate of Harris,* 166 Kan. 368, 201 P. 2d 1062, and cases there cited.) The burden was on the objector to prove lack of testamentary capacity and undue influence, which she alleged. (See *In re Estate of Hall,* 165 Kan. 465, 195 P. 2d 612; *Kunkle v. Urbansky,* 153 Kan. 117, 109 P. 2d 71; and *Klose v. Collins,* 137 Kan. 321, 20 P. 2d 494.)

Another rule to be observed in deciding whether a will should be admitted to probate is that the time when the will was made is the time of primary importance in judging the mental capacity of the testatrix. Evidence of capacity or incapacity before or afterwards merely aids in the investigation of testamentary capacity at the time the will was executed. (See *Wisner v. Chandler,* 95 Kan. 36, 147 Pac. 849, and cases there cited.)

Another rule it is well to bear in mind is that stated by us in *Wisner v. Chandler,* supra, as follows:

"It is a rule of law because it is a rule of common experience that a creation of the mind may be of such a character and may occur under such circumstances that it proves the sanity of the creative act."

In that opinion we quoted *Cartwright v. Cartwright,* 1 Eccl. Rep. 47. See, also, *Spratt v. Spratt,* 76 Mich. 384, 43 N. W. 627.

The turning point of this case is the lack of evidence of the objector. However, at this point we shall state briefly the evidence of proponents as to the making of the will.

The testatrix made arrangement to be taken to Ness City the day before. She did not say why. When she and her driver arrived they went to the office of a reputable lawyer there and the driver left. The evidence is undisputed that testatrix advised her lawyer that she wanted a will drawn and a deed prepared. They talked for an hour or two over a broad range of subjects. She told the scrivener she had a brother in Wichita whom she had not seen in thirty years. She stated to him she had been living in Argonia but that she had found out her relatives down there wanted her to support them rather than to help her. She spoke of two persons who had been good to her. One had been farming her land and a Mr. Gregg had taken her different places and brought food out to her on the farm. She said that her husband's people had been better to her than her own relatives and she had acquired title to the Ness county land through her husband. She said she was going to make a will leaving the land that had belonged to her husband to his people and she felt that with the two quarters she could do as she pleased. She had brought with her the legal description of the land she wished to devise and the land she wished to convey to Gregg. It was written on a piece of paper. The wife of the scrivener had prepared an income tax return for testatrix previously and testatrix asked her to prepare her income tax return that day. She provided all the necessary information, including tax receipts. She discussed the value of her property, stated that she had one quarter of Lane county land she had deeded to Gregg and she wanted to deed him the other quarter because one quarter by itself was of little value to anyone. It will be remembered that the two Lane county quarters were rough land and useful only as pasture. So there is ample foundation for her making such a remark about that quarter not being of much value in itself. She told the scrivener she had little property other

than the land and she was content to have that pass by inheritance. At that time she inquired about the effect the will that was being drawn had on a previous will and was advised it would revoke the former one. She selected her own witnesses. The scrivener suggested to her that it might not be wise to convey the other quarter to Gregg and she said if she couldn't deed it to him she would leave it to him in her will. The scrivener testified in answer to a direct question—

"Q. In talking to Mrs. Walter on that occasion, was there anything about her conversation, her appearance, or her acts which struck you as being out of the ordinary? A. Well, I would say out of the ordinary for younger people, but not out of the ordinary for a person of her age."

The scrivener testified she seemed alert, answered the scrivener's questions readily and was quite positive about what she wanted to do. She knew the name of the relatives at Argonia with whom she had lived and whose home she had left to come back to Ness City. The scrivener testified that in his opinion she understood the nature and extent of her property and she was able to understand and did understand to whom she wanted her property to go.

This evidence was corroborated by the scrivener's wife who prepared testatrix's income tax return at the same time.

All this occurred on the morning of January 10, 1944. The whole transaction is that of a person who knew what she had and what she wanted to do with it. In the words of the opinion in *Wisner v. Chandler*, supra, the entire transaction of having the will prepared constituted the creation of a mind under circumstances that really prove the sanity of the act.

There is a singular lack of medical testimony as to the mental condition of the testatrix.

There was, however, for the proponents the testimony of a physician who rented testatrix a small house in February, 1944, about a month after the will was drawn. He testified he told her to live in the house for two or three months and if she liked it she could buy it and if she did not like it she could pay rent. He was quite positive in his opinion she understood the transaction at the time the deal was made. There is some question that she did not understand because she did not go through with the deal to buy the house. Under interrogation of the court, however, the doctor was positive in his opinion she understood the deal when the transaction was made.

It must be borne in mind that for a will to be good the testator must know what he has, he must know the object of his affections and to whom he wishes his property to go and must understand the business in which he is engaged. The burden was upon the objector to prove testatrix did not possess these mental attributes on the morning of January 10, 1944. This takes us to an examination of the evidence offered by the objector. At the outset, it should be stated that frequent references will be made to Utica. That was the town where the Walters traded. Argonia is the town in Sumner county where she lived for a while.

We do not find it necessary to set out in detail the testimony offered by the objector. Suffice it to state the witnesses were with one exception, which will be noted later, laymen, neighbors and friends and one or two relatives. They testified about occasions when testatrix had apparently a mistaken notion that someone was running sheep on her land or pulling up her fence or running a still on one of her farms. She had a misunderstanding with a grandniece with whom she lived in Argonia; she made a practice of carrying a bundle, sometimes two bundles instead of a suitcase; in these bundles she carried odd objects, such as her dead husband's false teeth, old canceled checks and other odds and ends; she was not clean at times; occasionally wore overshoes to town with no shoes underneath them; she grieved over the loss of her husband, with whom she had apparently been happy; her life had been one of hard work, thrift and frugality on the Ness county farm. The situation is peculiar in that she seemed to have fallen out with her brother and sisters and nieces and nephews and her husband seemed to have fallen out with his. Whether there is any reason for this or not is not a proper question here. She did do some things that probably many people in Ness county would not have done. However, the record is devoid of any evidence that when she went to the scrivener on the morning of January 10 she did not know what she had and indeed it is overwhelming that she did know what she had and there is no evidence at all that she did not remember to whom she wanted it to go. As to whether or not she knew the natural objects of her bounty, there is no reason in the record why the nieces and nephews on her side were the natural objects any more than the nieces and nephews on her husband's side.

There was one medical witness for the objector. He testified that on August 14, 1944, he was a member of a commission that found

testatrix to be a schizophrenia and that she was incapable of performing the mental functions of making papers. The physician testified:

"Q. Based on what you found that day, do you now have an opinion as to how long that condition had existed at that time? A. Medically speaking, from history, it could have been any time from ·a year to a year and a half, for an indefinite period of time until demise."

It will be noted that that answer was not responsive to the question. He asked whether he had an opinion as to how long that condition had existed at that time. He answered:

"From history it could have been any time from a year to a year and a half, for an indefinite period of time until demise."

This did not constitute any evidence as to the condition of the testatrix on the preceding January.

It will be noted that several lay witnesses testified that in their opinion testatrix lacked testamentary capacity. Such testimony is competent where it has some reasonable basis. When a witness testifies that in his opinion testatrix lacked testamentary capacity, the inquiry is made upon what he bases that opinion. Then, in order for such an opinion to rise to the dignity of substantial evidence it must appear the opinion is based upon facts that sustain it. We considered this question in *In re Estate of Harris,* supra. There, four witnesses testified as to testator's lack of testamentary capacity. We said:

"Under well-recognized decisions of this court it must appear from the record such conclusions are based upon facts which sustain them, otherwise they do not rise to the dignity of 'substantial evidence' or come within the meaning of that phrase as used in the rule to which we have just referred."

The trial court in that case ordered the will be not probated. We reversed it and held there was no substantial evidence to sustain the finding of the trial court of no testamentary capacity. We cited *Klose v. Collins,* 137 Kan. 321, 20 P. 2d 494. That was an action to set aside a will brought by nieces and nephews of testatrix. The devisees were two banker friends of testatrix not related to her. Defendants' demurrer to the plaintiffs' evidence was sustained and the plaintiffs appealed. There, as here, a number of lay witnesses testified that testatrix was not mentally capable of making a will. These witnesses based their conclusions upon her weak physical and mental condition; that she was very childish, very forgetful, had a very poor memory, that she repeated statements, and did

not transact any business for herself but had her banker take care of it; that she said she would have to ask her banker if she could buy it. We said:

"We conclude that the showing of mental incapacity was not sufficient under all the facts and circumstances to require the setting aside of the will on that account."

In that opinion we referred to *Barnhill v. Miller*, 114 Kan. 73, 217 Pac. 274. There several witnesses testified that in their opinion testator lacked mental capacity. These opinions were based on the fact that testator did not know; his failure to recognize people; that he answered "uh-huh, uh-huh" when asked questions; there nearly always was somebody with him when he was on the street; sometimes he would be friendly, sometimes not; he left out phrases in his conversation; was a great sympathizer with Germany; he gave to each of his children $2,000 and the residue to a Catholic Society known as "The Propagation of the Faith." We said:

"In order to possess the mental capacity to make a valid will the law, based upon the experiences of mankind, does not require the testator to possess the ability to carry on complicated business matters. It is sufficient if he has mental capacity to know what property he has, and is able to make a disposition of it with understanding; that he knows the persons and objects of his bounty, and their condition and relation to him, and that he is able to dictate the terms of the will." (p. 75.)

An opinion of rare persuasiveness is *De Crow v. Harkness*, 100 Kan. 144, 163 Pac. 630. That was an action to set aside a will. The will was made January 17 and testator died January 28. Two doctors testified that for several days before the will was made the testator lacked testamentary capacity. Besides that, there was other evidence of one witness that sometime before he had looked troubled in mind. His daughter testified that when he saw her the day after he had made his will he threw up his hands and went into a fit, went to throwing up and couldn't talk for at least a half hour; he accused one doctor of treating him like a brute and another doctor of giving him poison. Another witness testified that when he saw him his actions were not in all respects those of a man of ordinary intelligence; he was rational sometimes and not right at others. Another witness testified that he seemed out of his mind at times and at times not. There was other evidence to the effect that he did have testamentary capacity. The jury found for the defendants and the will was set aside. On appeal we reversed largely on account of an in-

struction where the court told the jury that a person to be incapacitated to make a will need not be insane or incapable of understanding the ordinary business transactions. The testator may be capable of transacting ordinary business affairs of life and insane on other matters, but if the will was influenced and the direct offspring of an unfounded and insane delusion it cannot be sustained.

In this case the court stated:

"Although you may believe from the evidence that James W. Harkness was capable of transacting the ordinary business affairs of life, at or about the time he executed said will, yet if you also believe that at the time of the making of said will in controversy he was influenced in making said will and that the provisions in said will, cutting off the children by his first wife substantially from any of his property, was the offspring of an unfounded and insane delusion without the slightest pretense or color of truth, that his children of his first wife were unkind to him or mistreated him, then the will cannot stand and your verdict will be for the plaintiff." (p. 152.)

The court further stated:

"The Court instructs the jury in deciding whether or not James W. Harkness was of sound mind at the time of making the will in controversy you have a right to take into consideration the reasonableness or unreasonableness of the manner in which he disposed of his property, as a circumstance to be considered with all the other circumstances in the case; and if you believe that a man of sound mind would not have been likely to have discriminated against the children of his first wife in favor of a child of his then present wife, then you have a right to consider this circumstance in connection with all the other circumstances in the case in determining whether or not James W. Harkness had the mental capacity to execute the will in question." (p. 154.)

We said, in speaking of the will:

"It cannot escape notice that this will bears facial indications of having been dictated by one in full possession of his faculties." (p. 151.)

Also note:

"While the courts of other states and numerous textwriters seem to accord much more leeway to jurors and much less power of disposition to owners of property this court is on record for giving proper respect to the desires of a qualified testator. It is impossible to read the abstracts without the conviction that the principle to which this court is committed was departed from by instruction No. 2 and that the danger line was approached if not reached in instruction No. 8. The evidence that at the time the will was executed the testator was possessed of sufficient testamentary capacity is convincing if not overwhelming. In this condition of affairs courts have no right to disregard the will and wishes so clearly drawn and expressed, and for the reasons indicated the judgment is reversed, and the cause remanded for further proceedings in accordance therewith." (p. 156.)

See, also, *Holmes v. Campbell College*, 87 Kan. 597, 125 Pac. 25.

Attention will now be given to specific findings by the trial court; in the fourth paragraph of the 9th finding the court stated:

"In November, 1943, she returned to Ness county obsessed with the idea that relatives had never done anything for her and they were trying to get her property away from her. These ideas were contrary to the evidence of the case. Her friends tried to convince her that she was wrong. These obsessions seemed to increase."

The trial judge apparently had the idea there was more of an obligation on the part of the testatrix toward one group of nieces and nephews than toward another. Testatrix had some twenty-odd nieces and nephews on her side of the family, and the four on her husband's side whom she named in the will as devisees, the proponents of this will. The court states in its findings that testatrix had an obsession that her relatives had never done anything for her and were trying to get her property away from her and that this obsession was contrary to the evidence in the case. In order for an obsession to invalidate a will it must be established that it was really an insane delusion. The burden was not on the proponents of the will to prove there was a foundation for this feeling testatrix had about her relatives. The burden was on the objector to prove that there was no foundation for it. The court states the obsession was contrary to the evidence. That is not the point. The evidence of the objector in order to invalidate the will must show there was no foundation for it. As a matter of fact, there was testimony that testatrix had been unhappy when she was living in Argonia and her niece's daughter was staying with her. Something happened to upset her. What it was we do not know. We do not know the feeling to be without foundation, however.

In the sixth paragraph of finding No. 9 the court after stating the fact about testatrix calling on the scrivener to write her a will stated:

"On that day she was laboring under the insane delusion that her relatives had not been good to her and were trying to get her property so she stated to A. S. Foulks that Mr. Walter's relatives had been better to her than her relatives, which is contrary to the evidence. She also stated that the land was Mr. Walter's, while the evidence shows that she purchased one quarter before her marriage to Grant Walter and the other Ness County Quarter was acquired about seven years after her second marriage and the grantees in the deed were Elda A. Walter and Grant Walter."

This really when considered with the trial court's second conclusion of law appears to be the reason why the trial court refused the probation of the will. The court found her idea that the rela-

tives on her side had not been good to her and were trying to get her property was an insane delusion. There is no evidence whatever that this feeling was an insane delusion. Here again it must be observed it was not the duty of the proponents of the will to show that there was a reasonable basis for her thought that her relatives had not been good to her and were trying to get her property. The burden was on the objector to prove there was no foundation whatever for the testator to have that idea. As we stated in *DeCrow v. Harkness*, supra, with reference to Mr. Harkness' feeling that his children had not been treating him as a parent:

"A careful examination of the entire record discloses some reason for Mr. Harkness' feeling that his children had not treated him as a parent deserves or as he might expect from his own flesh and blood who lived within reach and failed to call on him in time of sickness. Also that there had been some discussion and irritation over his failure to divide up the property when his first wife died."

We also quoted from the case of *Wisner v. Chandler*, supra, as follows:

"It was not a figment of the testator's imagination. It was not a delusion springing from a mind disordered by disease. It had a solid basis in reality. However, much it may be regretted that the testator could not forgive, as Mrs. Wisner probably did, his resentment was human and natural, and if he magnified his injury and illogically and unjustly carried his resulting prejudice too far, so that it extended to the family over which Charles presided, he was not possessed of an insane delusion within the purview of any well-considered decision of which this court is aware." (p. 152.)

There is no doubt the testatrix told the scrivener that her nieces and nephews on her side had not been very good to her. As a matter of fact, from this record the testatrix might have been justified in feeling that they had not been as nice to her as they should. We have already referred to the trouble that happened with the niece down at Argonia. At any rate, there is no evidence whatever that there was an insane delusion. (See *Wood v. Wood*, 168 Okla. 198, 32 P. 2d 715; *Snell v. Weldon*, 243 Ill. 496, 90 N. E. 1061; *Wisner v. Chandler*, supra; *Bean v. Bean*, 144 Mich. 599, 108 N. W. 369; and *Akins v. Akins*, 109 Kan. 453, 199 Pac. 922.)

There we said, in *Akins v. Akins*:

"The evidence tended almost conclusively to show that the plaintiff had not in any way wronged his father in the management of the business or in the sale of it, although in the sale there was that which would excite the suspicions of many men. Grant that John Akins was mistaken, a mistake is not an insane delusion. A mistaken belief entertained by one that he has

been wronged by another is a very common frailty of humanity, but such belief is not necessarily an insane delusion."

See, also, *Firestone v. Atkinson*, 216 Iowa 151, 218 N. W. 293, and *In re Kendrick's Estate*, 130 Cal. 360, 62 Pac. 605.

The trial court by its findings seems to have placed great emphasis upon the fact that testatrix believed she had received title to the Ness county land from her second husband. The court in its conclusions of law refers to this as an insane delusion. The record shows there was sufficient foundation for this belief to prevent it from being an insane delusion, that is, she did receive the Ness county land on account of her husband's will and at the time of his death it was in his name. A more astute person might have seen that sometime or another the Ness county land had been in her name but since she did not receive it through her husband's will it cannot be said her belief she got it from him was an insane delusion.

It follows the proponent's demurrer to the objector's evidence should have been sustained.

The judgment of the trial court is reversed, with directions to render judgment in accordance with this opinion.

THIELE and WEDELL, JJ., dissenting.