BENJAMIN HAFER, *et al.*, v. VIRGINIA HAFER, *et al.*

1. ANTE-NUPTIAL CONTRACT, *Upheld.* The statutes of Kansas recognize the right of parties contemplating marriage to make settlements and contracts relating to and based upon the consideration of marriage, and an ante-nuptial contract providing a different rule than the one prescribed by law for settling their property rights, entered into by persons competent to contract, and which, considering the circumstances of the parties at the time of making the same, is reasonable and just in its provisions, should be upheld and enforced.

2. MARRIAGE; *Contract, Binding.* H., a widower who was fifty-six years of age, had a family of seven children, all of whom had reached majority except the youngest one, and who, with the united labor of his deceased wife and children, had accumulated a property of the value of $14,000 and upwards, in good faith entered into an ante-nuptial contract with B., a maiden lady of twenty-six years of age, who was possessed of two cows and $40, whereby they agreed that each should separately enjoy and have the untrammeled control of his and her own property, as well as the increase and profits thereof, and that if she should survive him she would receive from his estate a child's part; "that is, his estate shall be divided into an equal number of parts, equal to the number of children of said H., plus one, and the said B. shall receive one of said parts and no more." On the same day they were married, and in less than three years afterward, H. died, leaving property of the aggregate value of $19,000. The widow claimed an allowance of one-half under the law of descents and distributions, alleging that the contract was void because it was inequitable and uncertain. *Held,* That the provisions therein made for the widow were just and reasonable, and that the contract cannot be held invalid on the ground of uncertainty in stating the share of his estate to which she was entitled.

3. ———— Marriage is a good and sufficient consideration to sustain an ante-nuptial contract.

4. HOMESTEAD; *Minor Child; Partition.* Where the homestead of an intestate is still occupied by his widow and minor child, it is not subject to partition until the widow again marries or the child reaches majority, notwithstanding the ante-nuptial contract of the widow and her deceased husband, and notwithstanding the minor may, by her next friend, ask for its partition.

*Error from Jackson District Court.*

ACTION for partition of the real estate of Godfrey Hafer, who died intestate, on the 24th day of June, 1882, and left

29—33 KAS.

surviving him *Virginia Hafer*, his widow, and *Benjamin Hafer*, William G. Hafer, John H. Hafer, Louisa Hafer, Emma B. Hafer, George Hafer and James Hafer, his children. Benjamin Hafer and other of the children filed in the district court of Jackson county their petition making the widow, Virginia Hafer, James Hafer, George Hafer, and certain judgment creditors and the grantee of James Hafer, defendants. Therein it was alleged that on the 21st day of October, 1879, Godfrey Hafer had entered into an ante-nuptial agreement, in writing, with Virginia Hafer, *neé* Virginia Bowser, in the following terms:

"Ante-nuptial agreement, made October 21st, 1879, between Godfrey Hafer and Virginia Bowser, of Jackson county, Kansas:

" This indenture, made this 21st day of October, 1879, by and between Godfrey Hafer and Virginia Bowser, each of the county of Jackson and state of Kansas, witnesseth: That Godfrey Hafer, for and in consideration of the covenants and agreements on the part of the said Virginia Bowser hereinafter contained, has this day promised and agreed, and does hereby covenant, promise, and agree to and with the said Virginia Bowser, that he will marry and receive in marriage the said Virginia Bowser upon the terms, covenants, agreements and conditions hereinafter set forth.

" That the said Virginia Bowser, for and in consideration of the promises, covenants and agreements on the part of the said Godfrey Hafer hereinbefore mentioned and hereinafter set forth, has this day promised and agreed, and does hereby covenant, promise and agree to and with the said Godfrey Hafer, that she will marry and receive in marriage the said Godfrey Hafer upon the terms, covenants, agreements and conditions herein contained.

" That the said Godfrey Hafer and Virginia Bowser, and each of them, being fully advised and with full knowledge of what their right under the law of the state of Kansas would be in and to the property of the other if married without an agreement made with reference to said property before said marriage, and for the purpose of settling all questions as to the right of each or either of said parties in and to their said property and the property of each of them during the continuance of said marriage, and after separation by death or other-

wise, as we, the said parties, deem just and equitable between ourselves, our heirs, executors, administrators, and assigns, and for the purpose of preventing contention between any and all persons now interested in said property, or hereafter to be interested in the same, and in view of said marriage, and for and in consideration of the promises, covenants and agreements herein contained, the said Godfrey Hafer and Virginia Bowser, and each of them for themselves, their heirs, executors, administrators, and assigns, do hereby promise, covenant and agree and consent to and with each other that the said Virginia Bowser may and shall, during the continuance of said marriage so agreed upon by and between said parties as aforesaid, and after separation by death or otherwise, separately own, use, possess, convey and dispose of all property of every kind, both personal and real, belonging to her before said marriage, and all the rents, issues and profits thereof, to whomsoever she may choose, and in the same manner and to the same extent that she now can, or then could have done, had such marriage not taken place; and that at the death of said Virginia Bowser, all property separately owned by her, both real and personal, shall pass and vest in her heirs and assigns in the same manner and to the same extent that it would had such marriage not taken place.

"That if the said Virginia Bowser shall outlive the said Godfrey Hafer, and shall live with him during the continuance of said marriage, and be his wife at his death, she shall receive of and from the estate of the said Godfrey Hafer a child's part and no more; that is, his estate shall be divided into an equal number of parts, equal to the number of children of the said Godfrey Hafer, plus one, and the said Virginia Bowser shall receive one of said parts and no more.

"That the said Godfrey Hafer, his heirs and assigns, shall, during the continuance of said marriage so agreed upon by and between said parties, and after separation of said parties by death or otherwise, and forever, separately hold, own, use, possess, convey and dispose of all of the property and estate, both personal and real, now belonging to said Godfrey Hafer, and all the rents, issues and profits of said property, and every part thereof, (except the said part above called a child's part, to be received by said Virginia Bowser as above stated,) to whomsoever the said Godfrey Hafer, his heirs and assigns may choose, and in the same manner and to the same extent that he or they could have done had such marriage not taken place; and that at the death of said Godfrey Hafer, all prop-

erty now belonging to him, and all the rents, issues and profits of said property, and all property received by said Godfrey Hafer in exchange for or in any way resulting from said property, and every part thereof, (except the said part above called a child's part, to be received by said Virginia Bowser as above stated,) shall pass to and vest in the heirs of the body of the said Godfrey Hafer, and to his assigns, in the same manner and to the same extent that it would have done had said marriage not taken place.

"And it is hereby mutually and expressly agreed, understood and consented to by and between said parties, and by each of them for themselves, their heirs, executors, administrators, and assigns, that the said Virginia Bowser may and shall have the perfect right to, and that she is hereby authorized and empowered by the said Godfrey Hafer to convey by will, during the continuance of said marriage, and after separation by death or otherwise, all property now belonging to her, both personal and real, and all rents, issues and profits of said property, and all property received by her in exchange for or in any way resulting from said property, and every part thereof, to whomsoever she may choose, and to the same extent that she could have done had such marriage not taken place; and said Godfrey Hafer hereby consents to said will.

"And it is hereby mutually and expressly understood, agreed and consented to by and between said parties, and by each of them for themselves, their heirs, executors, administrators, and assigns, that the said Godfrey —— shall have the perfect right to and he is hereby authorized and empowered by the —— to convey by will during the continuance of said marriage, and after separation of said parties by death or otherwise, all property, both real and personal, now belonging to him, and all the rents, issues and profits of said property, and all property received by him in exchange for said property, or in any way resulting from the same, and every part thereof, to whomsoever he may choose, and to the same extent that he could have done had said marriage not taken place, (except the said part above called a child's part, to be received by said Virginia Bowser as above stated;) and the said Virginia Bowser, waiving all rights that she may or might have under the law in marriage without the foregoing contract, hereby consents to said will, and agrees to receive the amount above stated to be received by her in case she outlive him, in full of her interest and share of said estate.

In witness whereof, we have hereunto set our hands and seals, this 21st day of October, 1879.

GODFREY X HAFER. [Seal.]
                    mark.
In presence of          VIRGINIA BOWSER.   [Seal.]
J. T. PRICE,
MYRZA J. PRICE."

On the same day, and after the execution of this contract, Godfrey Hafer and Virginia Bowser were married, and they lived together as husband and wife until the decease of Godfrey Hafer.

It was further alleged that Godfrey Hafer died seized of several valuable tracts of real estate in Jackson county, Kansas, among them a quarter-section of land which for many years and until his death had been occupied by the decedent and his family as a homestead. It was further stated that during the lifetime of Godfrey Hafer, and before the execution of the ante-nuptial contract with Virginia Hafer, the decedent had made advancements to his several sons in different amounts, which are set out in detail, and which should be considered in determining the respective shares to which each was entitled, and in making partition of the real estate. The plaintiffs therefore asked that an account might be taken of the amounts of property given by Godfrey Hafer to his sons by way of advancement, and that a division might be made in accordance with the respective rights of the parties, allowing to Virginia Hafer, the widow, a child's part only, as provided in the ante-nuptial contract.

The defendant, Virginia Hafer, alleged that the ante-nuptial contract pleaded by plaintiffs is unfair, unreasonable and void, because, that there are material facts existing concerning the property of the decedent, his circumstances and financial condition, that should have been disclosed to her before the signing of the agreement, but which were concealed from her until long after the signing thereof; and that it ought not to be enforced because it does not make adequate provision for her support, and that the provision made therein is manifestly

disproportionate to the means and ability of the deceased to have provided for her, and that the agreement, ever after the execution thereof, had been disregarded and abrogated by the said Godfrey Hafer in the disposition of property and otherwise, and that he had failed to perform any of the conditions of the agreement after his marriage with her. She further alleged that the contract is unauthorized by the laws of the state, is repugnant thereto, and is contrary to a sound public policy of the state; and that the agreement is void upon its face, because that it is indefinite and uncertain in its provisions. She therefore asked the court to make a decree allotting to her in fee simple, one-half of all of the real estate described in the plaintiff's petition except the homestead, which, she averred, had been occupied as a residence by her and the infant daughter of the deceased, together with others of his children, and is not subject to partition, and adjudging the ante-nuptial contract to be null and void, and canceling the same.

The action was tried by the court at the June Term, 1883, and the facts found to be as follows:

### "CONCLUSIONS OF FACT.

"1. On October 21, 1879, Godfrey Hafer, being then fifty-six years of age, and the owner in his own right of the lands described in the petition, except the north half of the southeast quarter of section 33, in township 9, of range 13, and that part of the north half of the southwest quarter of section 34, township 9, of range 13, lying west of Cross creek, containing 40 acres more or less, and being also the owner of certain real estate in Cowley county, Kansas, and of a considerable quantity of personal property, the amount of which is not disclosed by the testimony, and Virginia Bowser, being then twenty-six years of age, and the owner of two cows and forty dollars in money, and no other property, signed the paper denominated an ante-nuptial contract, a copy of which is set out in the petition; said paper was drawn up by J. T. Price, then probate judge of Jackson county, under the sole direction of said Godfrey, and immediately before the signing thereof was read once by said Price to said Virginia in the presence of said Godfrey, and the rights she would have under the law in the property of said Godfrey, in case she married and survived him, were explained

to her by said Price, but what would be her rights in that event under the proposed contract were not explained to her. This occurred at the residence of said Price; and immediately after the signing of said paper, and on the same day, said Godfrey and Virginia were married by said Price, and the paper was left with him for safe-keeping, and is still in his possession.

"2. At the time of signing said paper, said Godfrey was indebted to his sister in a sum between $2,200 and $2,700, but the evidence does not show that this fact or any other fact concerning his financial condition was by him or any other person communicated to said Virginia before that event, or that she had any knowledge upon that subject.

"3. Before the signing of said paper, said Godfrey had made advancements to those of his children and in the amounts stated in the amendment to the petition.

"4. After the said marriage, said Godfrey sold and conveyed the lands in Cowley county for about $1,800, and eighty acres in Jackson county for about $1,200, his wife joining in the deeds, and purchased the 120 acres of Cross creek for about $1,700, and also paid to his sister the amount of his said indebtedness to her.

"5. During the existence of the marriage, said Godfrey conducted all the business in his own name, in his own way, and kept no account of and never accounted with or paid the said Virginia for any supposed interest she might have had therein.

"6. One child was born of said marriage, but it died before the death of said Godfrey.

"7. Said Virginia remained the wife of and resided with said Godfrey until June 24, 1882, when he died intestate, seized of the real estate described in the petition, leaving the seven children mentioned in the petition surviving him, the youngest of whom, to wit, Emma B. Hafer, is a minor, 14 years of age. The said Virginia remains unmarried.

"8. The southeast quarter of section 23, T.7, R.15, except the three acres sold therefrom, had for many years before said marriage been the homestead of said Godfrey, after said marriage remained, and at the time of his death was, the homestead of himself and family, and since his death has been and now is occupied as the family homestead by said Virginia and two of said Godfrey's sons and the said Emma B. Hafer.

"9. The real estate described in the petition at the time of said Godfrey's death was of the value of $15,000, and his personal estate of the value of $4,000.

"10. The defendants Rathbone, Sard & Co. commenced the action, obtained the judgment against E. A. Ely and James Hafer, and filed the abstract as in their answer stated.

"11. The defendants Studebaker & Welch commenced the action, and obtained the judgment and issued the execution against E. A. Ely and James Hafer as in their answer stated.

"12. On December 16, 1882, said James Hafer and his wife quitclaimed to Lowell & Walker all their interest in the real estate in the petition described, in full satisfaction of the above-described judgment of Studebaker & Welch; said Lowell & Walker being at the time the attorneys of said Studebaker & Welch in the action in which said judgment was rendered.

"13. The said children of said Godfrey Hafer were at the time of said marriage the owners of the one undivided half of the north half of the northeast quarter of section 26, in T.7, R.15, having inherited the same from their mother."

Upon the facts thus found the court made the following conclusions of law, to wit:

"CONCLUSIONS OF LAW.

"1. The so-called ante-nuptial contract is invalid, because, (1) it was not authorized by law, without consideration, and was inequitable; (2) it is void for uncertainty; (3) it is not shown that, at the time of the signing thereof, the financial condition of said Godfrey had been disclosed to or was known by said Virginia; (4) it was not understood by said Virginia when she signed it; (5) it was not carried out by said Godfrey, and said Virginia has received nothing under it.

"2. The said Virginia is the owner in fee of the undivided half of the lands mentioned in the petition, except the south half of the northeast quarter of sec. 26, T. 7, R.15, and of that she is the owner of an undivided one-fourth.

"3. Each of the children of said Godfrey Hafer, except James, is the owner of one-fourteenth (advancements to be considered) of the lands in the petition described, except the above exception, and of that each is the owner of three twenty-eighths, advancements to be considered as to seven twenty-eighths thereof.

"4. Lowell & Walker are the owners of the remaining one-fourteenth and three twenty-eighths of said land respectively, (advancements to be considered,) subject to a lien of the judgment of Rathbone, Sard & Co. to an extent in the *pro*

*rata* proportion such judgment shall bear to that of Stude-baker & Welch, neither having a priority of lien.

"5. Partition should be ordered, excepting the homestead, according to the foregoing conclusions."

It was adjudged and decreed by the court that the ante-nup-tial contract be canceled and held for naught, and that parti-tion of the real estate in question be made in accordance with the foregoing findings and conclusions. The plaintiffs, as well as the defendants James Hafer and his grantees and judgment creditors, allege error, and bring the case here for review.

*Hayden & Hayden,* for plaintiffs in error.

*Broderick & Rafter,* for defendants in error.

The opinion of the court was delivered by

JOHNSTON, J.: The main question in this case arises upon the validity of the ante-nuptial contract which was entered into by the decedent, Godfrey Hafer, and the defendant, Virginia Hafer, on the day of and immediately preceding their marriage. She now contends, and the court below held, that an ante-nuptial contract was unauthorized by the law of this state. To this we cannot agree. It is true that our statute of "de-scents and distributions" provides what disposition shall be made of the property of an intestate, and what share the widow shall take in his estate in the absence of any contract regulat-ing the disposition of their property interest, but there is no statutory provision which, either expressly or by implication, forbids the making of such a contract. Indeed, while there is no *express* authorization for making an ante-nuptial contract that will vary the rule provided by law for settling the prop-erty rights of the parties after the decease of either, yet our statutes clearly recognize the right of parties to make and en-ter into such agreements. Section 6 of the statute of frauds provides that—

"No action shall be brought . . . to charge any per-son upon any agreement made upon consideration of mar-riage, . . . unless the agreement upon which such action

shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person thereunto by him or her lawfully authorized." (Comp. Laws of 1879, ch. 43, § 6.)

This provision of our statute is substantially the same as § 4 of the English statute of frauds, which, under the interpretation of both the English and American courts, has been held as referring to and affecting marriage settlements and ante-nuptial contracts based upon the consideration of marriage. (Bishop on the Law of Married Women, § 806, and authorities cited.)

Recognition of such contracts is also found in the act respecting the rights of married women, which took effect at the same date as the statute relating to descents and distributions. There it is provided that "nothing in this act contained shall invalidate any marriage settlement or contract now made or to be hereafter made." (Comp. Laws of 1879, ch. 62, § 6.)

In many of the states there are statutes concerning jointure, and prescribing the method by which parties contemplating marriage may bar the right of dower and curtesy, and some of the decisions relied on as authority by the defendants were made in those states, and where jointures were held to be insufficient as a statutory bar, because they failed to follow the statute. But even in these cases it is generally held that an ante-nuptial contract, entered into in good faith by competent parties, and which is fair and equitable in its terms, will be upheld and enforced as an equitable jointure by courts of equity. Independent of any such statute, it is generally ruled that the parties may provide a rule by an ante-nuptial agreement changing the one provided by law in settling the property rights of parties entering the married condition. It has been said that—

"Such a contract is not a release of any right, but it is doing what is done every day in other things, namely: providing a rule by agreement, to be applied instead of the rule which the law would furnish in the absence of an agreement. Where this rule by agreement exists, dower on common prin-

ciples ought to be held not to attach." (2 Bishop on the Law of Married Women, § 418.)

The same author states—

"That before the statute of uses, and therefore independently of the sections concerning jointure, if a husband and his wife had entered into an ante-nuptial agreement whereby she accepted any provision therein made by him in lieu of dower, this undertaking bound her in equity, and she could not have dower on his death. The same law prevailed after the statute was enacted, whence may be traced the doctrine in part, of what is called equitable jointure, in distinction from jointure under the statute of uses, and the rules thereon by the common-law tribunals. And it is said that while legal jointure rests on the statute, equitable jointure rests on the rule of equity as existing before the statute was enacted." (Id. § 420.)

And again, he says:

"From these views it follows that if a man and woman about to marry choose, they may arrange their property rights between each other in almost any manner, differing however much from what the law in the absence of contract would direct." (Id. § 28.)

In speaking of the policy of such contracts, the supreme court of Ohio, in *Stilley* v. *Folger*, 14 Ohio, 649, says:

"*Ante-nuptial contracts* have long been regarded as within the policy of the law, both at Westminster and in the United States. They are in favor of marriage, and tend to promote domestic happiness by removing one of the frequent causes of family disputes, contentions about property, and especially allowances to the wife. Indeed, we think it may be considered as well settled, at this day, that almost any *bona fide* and *reasonable agreement*, made before marriage to secure the wife in the enjoyment either of her own separate property, or a portion of that of her husband, whether during the coverture or after his death, will be carried into execution in a court of chancery."

It would seem from the authorities, that agreements of this kind are generally looked upon by the courts with favor, and are to be liberally interpreted with a view of carrying out the intentions of the persons engaging in them. We entertain no doubt, in the present state of our statutes, of the validity of

an ante-nuptial contract, entered into in good faith by parties competent to contract, and which, considering the circumstances of the parties at the time of making the same, is reasonable and just in its provisions, and that the rule thus agreed upon will take the place of that prescribed by the statute, in the distribution of their property upon the death of either. (1 Bishop on the Law of Married Woman, §§ 24–29, 360, 363, 418, 420, 422, 427, 805; 2 Bishop on the Law of Married Women, §§ 334, *et seq.; 1* Bishop on Marriage and Divorce, §§ 14, 15; Scribner on Dower, p. 385; *Naill v. Maurer,* 25 Md. 532; *Jacobs v. Jacobs,* 42 Iowa, 600; *McGee v. McGee,* 91 Ill. 548; *Stilley v. Folger,* 14 Ohio, 610; *Mintier v. Mintier,* 28 Ohio St. 307; *Andrews v. Andrews,* 8 Conn. 79; *Findley v. Findley,* 11 Gratt. 434; *Charles v. Charles,* 8 id. 486; *Pierce v. Pierce,* 71 N. Y. 154; 17 Cent. L. J. 384, and cases cited.)

It was also held in the court below, that the contract was without consideration. Clearly, this is not so. In addition to the reciprocal agreements therein, it has for its support the consideration of marriage, which is not only a valuable consideration, but has been held to be "the highest consideration known in law," and is undisputably sufficient to sustain an ante-nuptial contract. (1 Bishop on the Law of Married Women, §§ 775, 805, 806; *Naill v. Maurer,* 25 Md. 532; *Johnston v. Dilliard,* 1 Bay, 232; 4 Kent's Com. 464.)

Another reason given why the contract should be held invalid was, that it was inequitable. Wherein its inequity consists, we cannot see. At the time the contract was made, Godfrey Hafer was a widower, fifty-six years of age, with seven children, all of whom had reached majority except the youngest one, who was fourteen years of age. They, together with his deceased wife, had by their labors accumulated a property of the value of $14,000 and upwards. Virginia Bowser was a maiden of twenty-six years, and the only property she could bring to the union, aside from her clothing, was two cows and $40 in money. It was his duty, under these circumstances, to make suitable provision for the children by his first wife. By the terms of the contract, Virginia was given the sole control

of her own property, together with the increase and profits thereof, and in case she survived him she was to share equally in the estate with his children. Considering his age, his expectancy of life, under the ordinary rules of computing its duration, was but short. And the fact is, that he died in less than three years after the marriage. At the time of his decease his property had increased to the value of $19,000.

In view of these considerations, we are all united in the opinion that adequate provision was made for Virginia, and that the contract, as far as it concerned her, at least, was fair and highly equitable. (1 Bishop on the Law of Married Women, §§ 422, 423; *Naill v. Maurer*, supra.) Nor do we think that it can be held to be invalid upon the alleged ground of uncertainty. An examination of its provisions convinces us that they could not well be misunderstood. The chief complaint in this regard is, that the proportion of his estate which she could take under the agreement is uncertain. It is provided therein that during coverture each shall have the untrammeled control of his or her property, as well as the profit thereon, and if she should outlive him she will receive a child's part; "that is, his estate shall be divided into an equal number of parts, equal to the number of children of the said Godfrey Hafer, plus one, and the said Virginia Bowser shall receive one of the said parts and no more." The rule of division prescribed by the contract is as definite and certain as the rule provided by the legislature for the distribution of the estate of an intestate; and applying the maxim, "That is sufficiently certain which can be made certain," we hold the contract to be unobjectionable by reason of uncertainty. The same strictness is not required in these contracts as in the case of a statutory or legal jointure. (See authorities heretofore cited.)

It is further claimed that the contract is invalid because "it was not shown that, at the time of the signing thereof, the financial condition of said Godfrey had been disclosed to or was known by said Virginia, and that it was not understood by said Virginia when she signed it." Transactions of

this kind should be characterized by frankness and the good faith of the parties.    Any imposition or designed concealment by which either of the parties might be misled or defrauded, would operate to defeat the contract.    We search the record in vain, however, for any testimony that will sustain the finding that there was any deceit practiced by Godfrey Hafer, or that his conversation and conduct in the transaction were other than open, honest, and fair.    She had reached mature years, and the testimony shows her to be fairly intelligent, and capable of understanding the provisions of a contract so plain and intelligible as were those in the one under consideration.    She testified that "Godfrey Hafer spoke to her about entering into a written contract of marriage about fifteen or twenty minutes before they were married; that they went together to the residence of J. T. Price, the probate judge of Jackson county, who had a contract already drawn up; it was read over once, and signed by them a few minutes before they were married."    No other testimony was given regarding the conduct of Mr. Hafer at the time the contract was executed, except that of the probate judge who drew the contract.    He says that before the contract was signed he read it over and explained its provisions to the parties before they signed it; and that some portions of the contract *were read over and explained to them more than once.* It is true, as she states, that at the time they were married he was indebted to his sister for money which he received from the estate of his brother, George Hafer, and to which the sister was entitled as the heir, and that she did not know of this indebtedness at the time of the marriage.    No claim is made by her that he misrepresented his financial condition in any respect, nor that he purposely concealed any fact in relation thereto from her, nor does it appear that any complaint or dissatisfaction was ever expressed by her in this regard after the marriage and before his death.    The mere fact that he may not have disclosed his assets and liabilities in detail to her, will not, in the absence of anything showing fraud or deceit, invalidate the contract, nor will it raise a presumption

of fraudulent concealment; and especially is this so where the terms and provisions of the contract are so manifestly fair and reasonable as in this case.

It is further claimed that the contract ought not to be held valid, because the conduct of the parties after it was executed showed that they had abandoned and abrogated it. We see nothing in the testimony brought up in the record which warrants this assumption. On the other hand, it appears to us that their conduct was entirely consistent with the theory that the instrument was always regarded by both as a subsisting and valid agreement.

Upon the trial, some testimony was offered by Virginia Hafer in her own behalf concerning communications which she had personally with Godfrey Hafer in respect to the making of the ante-nuptial agreement, and which was objected to by the plaintiffs. It clearly came within the prohibition of § 322 of the code, which provides that "No party shall be allowed to testify in his own behalf in respect to any transaction or communication had personally by such party with the deceased person when the adverse party is . . . heir-at-law, . . . where they have acquired title to the cause of action immediately from such deceased person," and therefore to that extent her testimony was inadmissible and should have been excluded.

Plaintiffs finally complain of the ruling of the court in finding that the home farm was occupied by the family as a homestead at the time of trial, and its conclusion that it was not subject to partition. The finding of fact upon this question is as follows:

"The southeast quarter of sec. 23, T. 7, R. 15, except the three acres sold therefrom, had for many years before said marriage been the homestead of said Godfrey, after said marriage remained, and at the time of his death was, the homestead of himself and family, and since his death has been and now is occupied as the family homestead by said Virginia and two of said Godfrey's sons and the said Emma B. Hafer."

This finding, we think, is sufficiently supported by the testimony, and the court rightly held that partition of the home-

stead could not be made. The ante-nuptial contract in question does not in terms refer to the homestead privilege, nor do we think any of the provisions of the contract embrace what was intended by the parties as a release or waiver of such privilege. But independent of the contract, we remark that the homestead is not made alone for the husband and wife, or of either one, but it is also designed as a protection for the family who may be dependent upon them for maintenance. Considerations of public policy also entered into the enactment, by making such provision as will prevent their helpless children and dependents from becoming a public charity. To this end, and with a view of carrying out these purposes, guards have been thrown around the homestead. Strict constitutional and statutory restrictions have been placed upon its alienation. When it is occupied by the family it can only be alienated by the joint consent of husband and wife, when that relation exists; and at the death of the owner, if the homestead is still occupied by the widow and children, the law prohibits its distribution under any of the laws of the state and from the payment of the debts of the intestate, and provides that partition shall not be made until such time as the widow shall again marry, or when all of the children arrive at the age of majority.

In view of these considerations, and of the policy of the law which has been so frequently stated by this court, we think the right of occupancy of the homestead by the family of the intestate is not affected or disturbed by the ante-nuptial contract. We are not without authority upon this question. The supreme court of Illinois held in a case analogous to this one, that the policy of the law in relation to the homestead privilege is to preserve the same for the benefit of the family as well as the owner, and could not be abrogated by an ante-nuptial contract theretofore entered into between the husband and wife. (*McMahill v. McMahill*, 105 Ill. 596; *Phelps v. Phelps*, 72 id. 545; *McGee v. McGee*, 91 id. 548.)

It has been contended by plaintiffs that the minor child, having appeared in court and asked partition of the homestead,

has thereby waived her right to the homestead privilege.   But keeping in view the policy of the homestead laws and the motives of public concern which led to their enactment, we cannot agree to a construction of the homestead law that would permit a homestead, occupied by the widow and minor child, to be defeated and the family relation broken up by a wayward child appearing in court, and through, perhaps, a meddlesome friend asking for a partition of the property.   We conclude that so long as the homestead is occupied by the family of the deceased, and until the widow again marries, or the children arrive at the age of majority, no partition of the homestead can be made.

From the views herein expressed, it follows that the order and decree of the district court must be reversed.

All the Justices concurring.