No. 37,804

In the Matter of the Estate of John E. Schippel, Deceased. (JAMES A. JENNERSON, *Appellee*, v. ROSE M. SCHIPPEL, *Appellant*.)

(218 P. 2d 192)

Opinion filed May 6, 1950.

*LaRue Royce,* of Salina, argued the cause, and *E. S. Hampton, H. H. Dunham, Jr., John Q. Royce,* and *H. G. Engleman,* all of Salina, and *Charles A. Walsh,* of Concordia, were with him on the briefs for the appellant.

*T. M. Lillard,* of Topeka, argued the cause, and *Ralph Knittle* and *Alexander H. Miller,* both of Salina, were with him on the briefs for the appellee.

The opinion of the court was delivered by

PRICE, J.: This is an action in the nature of a will contest, and the questions for determination concern the validity of the last will and testament of John E. Schippel, dated July 10, 1939, and the validity of a document dated February 21, 1941, as an antenuptial contract and codicil to the will. The proponent of both instruments is one Jennerson, the principal beneficiary under the will, while the contestant is the surviving widow of the testator. After a full hearing the probate court admitted to probate the instrument of July 10, 1939, as and for the last will and testament of the testator, together with the instrument dated February 21, 1941, as and for a codicil and amendment to said will. An appeal was taken to the district court where the matter was heard on the transcript of evidence and the files introduced in the probate court. The district court made extensive conclusions of fact and conclusions of law in which the findings and orders of the probate court were upheld, following which the widow perfected her appeal to this court.

Error by the district court in its conclusions of fact and law is alleged in many respects, but, as heretofore stated, the only issues before us concern the validity of the two instruments in question.

We first take up and discuss the evidence with respect to the background of events and the circumstances in connection with the execution of the will.

John E. Schippel (hereinafter referred to as John) was a bachelor farmer and lived about six miles northeast of Salina. He had lived in the community his entire life. In 1903 James A. Jennerson, a boy fourteen years of age, came out to the Schippel farm to work.

He went to school in the wintertime and worked full time in the summer. He lived with the Schippel family more or less as a part of it. Later John's father, Gothardt Schippel, died, leaving a large amount of real estate and some personal property and John managed the estate. In 1918 Jennerson was married and he and his wife moved into a house built for them by John a few hundred yards from John's home. He continued to do farm work for John and apparently a very close relationship existed between the two with respect to the farming operations. However, John at all times retained full control of the management and made all decisions. Between the years 1918 and 1932 John paid Jennerson $1,000 a year for his services, but the latter and his wife occupied the house built for them by John rent-free. In 1932 the estate of John's deceased father was divided among the children and John received as his share the homeplace, consisting of several hundred acres of real estate, and other property. Jennerson continued to live on the farm and work for John, receiving as payment therefor only his grocery bill and the occupancy of the house heretofore referred to.

The evidence further shows that over the period of years in question John stayed close to the farm and did not travel around much or go into town very often. He owned an automobile but did not drive. When he went in to town Jennerson usually drove him. Among his neighbors and acquaintances he had the reputation of being a man of strong convictions and was known as a forceful character. He enjoyed having friends come out to see him. He had a safety deposit box in one of the Salina banks and transacted his own business affairs. Over the period of years a close friendship existed between John and Jennerson and each had the utmost respect of the other. Each of John's four brothers and sisters had received his or her share of the father's estate, and John on various occasions had told several of his close friends that he intended to leave all of his property to Jennerson provided the latter continued to stay on the farm and work for him until his death.

In May, 1939, John, who was then sixty-three years of age, suffered a slight heart attack which put him to bed for a while and confined him to his house. Dr. Pederson, an osteopath in Salina, treated him. His illness was not regarded as particularly serious.

On June 2, 1939, Jennerson went to the office of W. S. Norris, a Salina lawyer, and asked him to prepare a will for John; that John was too ill to come to town himself but that he, Jennerson, had all

of the information necessary for the preparation of the will. Norris questioned him concerning the provisions of the proposed will and Jennerson told him that since John's brothers and sisters had received their full share of the father's estate John wanted to leave each of them only one dollar, and that with the exception of an eighty acre tract which he wished to devise to the two daughters of an old friend, now deceased, he wanted to leave all of his property to him, Jennerson, because of the latter's faithful work and services for John for the past thirty-six years. In this same conversation he also asked Norris to prepare a deed conveying to him John's undivided one-half interest in a quarter section of land which he and John had purchased and held as tenants in common since 1919. Norris prepared the will in accordance with the directions given to him by Jennerson; also the deed. Prior to this date Norris was not personally acquainted with either John or Jennerson. Norris retained the will and deed in his office file.

On Saturday, July 8, 1939, Jennerson contacted Norris with reference to bringing the will out to John's home for execution and some discussion was had concerning witnesses. Since Dr. Pederson was going to give John a treatment on the morning of July 10, it was suggested that Norris and John's banker come out to the farm on that morning, and they, together with the doctor, could serve as witnesses to the execution of the will. Accordingly, on the morning of July 10, Norris and Mr. Ludes, an official of a Salina bank, and with whom John had for a number of years transacted business matters, drove out to the farm. The doctor was just completing a treatment. Norris and Ludes went into the house, introductions were made and there was some informal conversation concerning the weather and a cooling system unit John had, after which Norris told John that he had with him the will which Jennerson had asked him to prepare. Norris testified that he handed it to John and told him to read it over and see if it was satisfactory, or words to that effect. There is a dispute in the evidence concerning whether Norris read the will aloud to John in the presence of the other witnesses or whether John read it himself, but, in any event, all of the testimony is to the effect that John heard the will read to him or else read it himself and expressed complete satisfaction with all of its provisions, following which John signed it in the presence of Dr. Pederson, Ludes and Norris. Each of them signed as a witness in the presence of John and of each other. Before the witnesses signed Norris asked

John if he declared the instrument to be his will and he replied in the affirmative. The deed was then mentioned and John signed it, his signature being witnessed by Dr. Pederson and Norris, and Ludes, who was a notary public, took John's acknowledgment. John then directed Ludes to take the will with him and place it in John's safety deposit box in the bank. This was done.

The evidence is conflicting on the question whether Jennerson was present when the will was signed. The evidence shows that John was of sound mind, in possession of all his mental faculties and knew and understood the contents of his will and what disposition was being made of his property. The will bequeathed one dollar to each of the four brothers and sisters of John; devised the eighty acre tract to the two daughters of the deceased long-time friend of John's, and bequeathed and devised all of the rest and remainder of the property to Jennerson in the following language:

"FOURTH: I do give, devise and bequeath unto James A. Jennerson who has been my faithful friend and employee for the past thirty-five years all the rest, residue and remainder of the property which may be owned by me at the time of my death, real, personal or mixed, in recognition of his faithful and loyal service and his care and kindness to me and his attention to my property and interests during my lifetime, including specifically the following described real estate, but not excluding any other real estate which I may own or in which I may have an interest at the time of my death, to-wit: . . ."

Jennerson was designated to serve as executor, with the request that he not be required to give bond. So far as the evidence discloses, the will remained in John's box at the bank until after his death.

We pass now to the circumstances surrounding the execution of the antenuptial contract and codicil to this will of July 10, 1939.

On February 20, 1941, John came into Norris' law office. The latter did not immediately recognize him and after a short preliminary conversation in which the circumstances of the will of July 10, 1939, were recalled, John told Norris that he was going to be married and wanted a contract prepared by which he and Rose Wessling, his intended spouse, in the event of death would each receive a life interest in the property of the other. Norris told him that he could prepare such a contract but that it would not be valid unless each of the parties fully understood the circumstances, the extent of the property of each and the respective rights of each upon their marriage. He testified that John replied, "Well, we understand each other and have known each other for a good many years;

she knows my property and I know what property she has." He prepared a contract and later the same day John came back into the office, at which time he and Norris went over its provisions. John objected to a reference to the specific will made in 1939, and then said something to the effect he either had already explained the whole thing to Rose or else would do so. Norris redrafted that part of the instrument accordingly. The next day John and Rose came into Norris' office. John said that they had come in to sign the contract, whereupon Norris handed each of them a copy to read. They did so and upon being asked if they were ready to sign each replied in the affirmative. Norris then called in a Mr. Jenkins, his lawyer associate, and his secretary, Miss Coop. John and Rose each signed the instrument and Norris, Jenkins and Miss Coop signed as witnesses. According to Norris he did not make any explanation of the provisions of the contract and Rose asked no questions. He gave each of them an executed copy and retained one in his office file.

Jenkins, who resided at Omaha at the time of trial, testified by deposition concerning the execution and witnessing of the instrument, and his testimony was to the effect that Norris asked John and Rose if they had read and knew the contents of the instrument and were ready to sign and that each either said "yes" or nodded his or her head in the affirmative, following which each signed and the signatures were witnessed by him, Norris and Miss Coop.

Rose Wessling was a maiden lady who lived about five miles south of Salina. In 1941 she was sixty-two years of age. Her father and John's father had been boyhood friends and she and John had known each other all their lives. The record is silent concerning their courtship, but on February 20, 1941, she and John decided to get married on February 22. According to her testimony, on the afternoon of February 20 she left John at his home and then started out to make arrangements for the wedding. She had dinner with John at his home on the noon of February 21 and that afternoon she and John drove in to Salina to buy some clothes and get the marriage license. After John bought the license he told her that they had to go to Norris' office to sign a contract. According to her this was the first mention of any contract and there had been no discussion whatever concerning their property rights. They were to be married the next morning at six o'clock. They went to Norris' office and her testimony concerning the execution of the contract was substantially that as given by Norris, except that she testified she "just glanced

it over." She further testified that at no time did she know anything about the will of July 10, 1939, or about any agreement between John and Jennerson whereby Jennerson was to receive practically all of John's property as payment for his long services to John, and that no explanation was ever made to her concerning her rights under the law in John's property, and that at the time she executed the contract she did not understand its provisions or the legal effect thereof. She further testified that at no time during her married life did John ever tell her that he had made a will.

On cross-examination Rose testified that her father died in 1913, and from then on she and her sister lived together on the farm until 1938, when the latter died. Thereafter she lived on the farm alone until her marriage. Her average income from her own property, valued at about $24,000, was $2,000 per year. Over a period of years she had worked hard, managed her own farm and had attended to all of her own business affairs and was thoroughly familiar with the management of farm properties. She stated that after she and John had signed the contract she took her copy, which Norris had given her, and handed it to her brother Henry for safekeeping, but that she had never read it over until after John's death, even though she had access to it during the whole period in question. While denying knowledge of specific properties owned by John, she admitted that in a general way she was familiar with John's property and the extent thereof.

Henry Wessling, Rose's brother, testified that on the afternoon of February 21, 1941 (being the day before the wedding), John and Rose came to his house, at which time Rose gave him some papers for him to keep for her; that John handed him the contract and told him to read it; that he did so but that he did not discuss its contents with Rose either at that time or later, and that Rose never mentioned it to him.

The contract is as follows:

### "ANTENUPTIAL AGREEMENT

"This indenture, made this 21st day of February, 1941, by and between, John E. Schippel of Saline County, Kansas, party of the first part, and Rose Mary Wessling of Saline County, Kansas, party of the second part, Witnesseth:

"Whereas a marriage is contemplated and is shortly to be solemnized between the parties to this agreement, both of whom are now single and unmarried persons and neither of whom has ever been married before or has any children; and

"Whereas each of the parties to this agreement is the owner of real and personal property and each of the parties hereto is familiar with the nature, extent and amount of property owned by the other and each of the parties hereto desires to retain the right to control. and dispose of the separate property which he or she may now own or may acquire in his or her name; upon the death of either of such parties, to the extent hereinafter set forth and provided for; and

"Whereas the marriage contract between the parties hereto has been entered into and the marriage relation between them is to be entered into and consummated in consideration of the mutual covenants and agreements on the part of each of said parties as herein set forth:

"Now Therefore, it is agreed by and between the parties to this agreement, in consideration of the premises herein set forth and in consideration of the agreement made by each of the parties hereto with the other, and in contemplation of said proposed marriage between them, as follows:

"If the said John E. Schippel, party of the first part, shall die prior to the death of the party of the second part, and while said second party is his wife, the said party of the second part, as his widow, shall have a life interest and estate in and to all of the property, real and personal, owned by the party of the first part at the time of his death, with the right to hold and use the same and to have the income therefrom for and during the remainder of her life, but at her death the property left by the party of the first part at his death, real and personal, shall revert to and become a part of the estate of the party of the first part and shall be disposed of in accordance with the terms and provisions of the Last Will and Testament of said John E. Schippel, party of the first part, either as now made or which may hereafter be made by him and any such will, now or hereafter made by said John E. Schippel, shall be and remain in full force and effect according to the will and desire of the said John E. Schippel and shall be executed according to its terms, subject only to such modification thereof as is provided for in this agreement, to the extent of the life interest in his property which shall be held and used by said party of the second part under the conditions and for the time herein specified, and said party of the second part, Rose Wessling, does hereby consent to the Will now made by the said John E. Schippel, or to any Will which he may hereafter make during his lifetime and does consent and agree to any disposition which he may make of his property therein, subject only to the provisions made for her under the terms of this agreement and by the provisions thereof.

"If the said Rose Mary Wessling, party of the second part, shall die prior to the death of the party of the first part and while said first party is her husband the said party of the first part, as her widower, shall have a life interest and estate in and to all of the property, real and personal, owned by the party of the second part at the time of her death, with the right to hold and use the same and to have the income therefrom for and during the remainder of his life, but at his death the property, left by the party of the second part at her death, real and personal, shall revert to and become a part of the estate of the party of the second part, and shall be disposed of and shall go to her heirs, other than her said husband, according to the laws of descent and

distribution if she dies without leaving a Last Will and Testament, or in accordance with the terms and provisions of any Last Will and Testament which she may hereafter make, and any Will which she may make hereafter shall be and remain in full force and effect according to her will and desire as expressed therein, and shall be executed according to its terms, subject only to such modification thereof as is provided for in this agreement, to the extent of the life interest in her property which shall be held and used by the party of the first part under the conditions and for the time herein specified, and said party of the first part, John E. Schippel, does hereby consent to any will which said party of the second part may hereafter make during her life time and does consent and agree to any disposition which she may make of her property therein, subject only to the provisions made for him under the terms of this agreement and by the provisions hereof.

"It is further understood and agreed and it is the intention of this contract that neither party shall have or acquire, by reason of the marriage now contemplated by them, or as the result of said marriage after the same is solemnized, any right or interest in or to the property of the other, now owned or hereafter acquired by either of said parties, except to the extent of the life interest therein as herein provided for, which shall inure under the terms of this agreement to the survivor of the two parties hereto, to the extent and under the conditions herein provided for and each of the parties hereto does hereby release the other party, and the estate of the party who may first die, from any and all claim, right, title or interest in or to the property of the party who may first die, except to the extent of the life estate and interest as herein provided for.

"In Witness Whereof, the parties have hereunto set their hands, to duplicate copies hereof, and to which covenants and agreements the said parties mutually bind themselves, their heirs, executors, administrators and assigns, by these presents duly executed the day and year first above written.

"S/ John E. Schippel<br>
Party of the first part<br>
"S/ Rose Mary Wessling<br>
Party of the second part

"The foregoing instrument of writing was signed by John E. Schippel and Rose Wessling in the presence of the undersigned witnesses and was by them duly acknowledged and represented to be the free act and deed of them and each of them and to have been entered into by each of them with full understanding of the contents and meaning thereof, and the undersigned have hereunto set their hands in attestation thereof, in the presence of said John E. Schippel and Rose Mary Wessling and in the presence of each other, at Salina, Kansas, this 21st day of February, 1941.

"S/ W. S. Norris        Salina, Kansas<br>
"S/ Audrey Coop        Salina, Kansas<br>
"S/ Homer B. Jenkins        Salina, Kansas"

John and Rose were married the next day, February 22, 1941, and lived together on John's home place until John's death on April 7, 1948.

At the outset we concede the rule urged by appellant to the effect that since the district court heard and decided this case upon the transcript and files of the proceedings in the probate court we are not bound by the familiar rule of appellate review that where findings of the trial court are supported by substantial, competent evidence they will not be disturbed on appeal. In the case before us we concede that it is our responsibility to decide what the facts establish. (*In re Estate of Davis,* 168 Kan. 314, 212 P. 2d 343.)

With reference to the will of July 10, 1939, it is the contention of appellant that Jennerson is the principal beneficiary thereunder; that it was written or prepared or caused to be written or prepared by him; that at the time it was written or caused to be prepared by him he was the confidential agent of or occupied a position of confidence and trust to John, and that John had no independent advice with reference to the will and that it is therefore void under the provisions of G. S. 1947 Supp. 59-605, which reads:

"If it shall appear that any will was written or prepared by the sole or principal beneficiary in such will, who, at the time of writing or preparing the same, was the confidential agent or legal adviser of the testator, or who occupied at the time any other position of confidence or trust to such testator, such will shall not be held to be valid unless it shall affirmatively appear that the testator had read or knew the contents of such will, and had independent advice with reference thereto."

On the other hand, appellee argues that the independent advice requirement of the statute applies only where the principal beneficiary writes or prepares the will and who at the time of writing or preparing the same is the confidential agent of or legal adviser to the testator, or who at the time occupied any other position of confidence or trust to such testator, and that the evidence not only fails to show that Jennerson (who is conceded to be the principal beneficiary) wrote or prepared the will but also fails to show that at the time in question he was the confidential agent of or legal adviser to John, or occupied any other position of confidence or trust to him as contemplated by the statute.

Questions involving the interpretation of this statute (and of the former statute, G. S. 1935, 22-214, which in substance is the same as the present statute) have been before this court on many occasions and it has been repeatedly held that it means exactly what its very language states, namely, that it applies (1) when the will is written or prepared by the sole or principal beneficiary (2) who is the confidential agent or legal adviser or who occupies some other

position of confidence or trust to the testator, and that when these conditions exist the will shall not be held valid unless it shall affirmatively appear (1) that the testator read or knew the contents of such will *and* (2) had independent advice with reference thereto. (*Flintjer v. Rehm,* 120 Kan. 13, 241 Pac. 1087.)

Counsel for appellant admit that in a literal sense Jennerson did not write or prepare the will but argue that the evidence clearly shows that he *caused* it to be written and prepared within the meaning of the statute and that under the circumstances Norris is to be recognized merely as the scrivener. That Jennerson supplied the information to Norris to be included in the will cannot be denied— but the question is, does such fact, together with the other circumstances, bring him within the statute? Counsel for appellee contend that beyond question Jennerson's actions render him merely the "messenger" in bringing to Norris the information concerning John's wishes to be followed in preparing the will and that he truthfully delivered John's message to Norris.

It may be conceded that under some circumstances a person occupying such a position of "go-between" could be considered and held to be the one "writing or preparing" a will within the meaning of the statute, but we do not think that any such inference or conclusion can be drawn from the evidence before us in this case. Norris testified that Jennerson told him that John was too ill to come in to the office at that time but had sent him in to give him, Norris, the information as to what John wanted in his will. Then followed a detailed conversation between the two as to the proposed provisions and Jennerson gave Norris the legal description of a number of tracts of real estate owned by John so that they could be mentioned specifically in the will. Furthermore, that Jennerson truthfully reported John's wishes to Norris is borne out by the testimony of other witnesses relating to conversations had with John.

Dr. Pederson testified that on the occasion of a previous professional call John had told him he was going to leave his property to Jennerson because of the long, faithful service the latter had given him and that it was "the right thing to do".

Another witness, a Mr. Rose, who had lived about a mile and a half from John for over forty years, testified that on an occasion when he and John were "tending cattle" John remarked, "This is Jim's (Jennerson) after I am gone."

Still another witness, Albert Hahn, who was seventy-five years

of age and had known John since the latter was a child, testified that after John had received his share of his father's estate in the division made in 1932, John told him that if Jennerson would continue to stay and work for him he would give him his property.

No question is raised concerning John's mental competency either before or at the time the will was executed. The testimony of the attesting witnesses is that John either read it or it was read to him and that he expressed complete satisfaction with its terms. Later, in February, 1941, when he was in Norris' law office with reference to the preparation of the antenuptial contract, the will was again discussed and all of the evidence on the question leads to the inescapable conclusion that at that time John again ratified and confirmed its provisions. In view of all these facts and circumstances, how can it be said that within the meaning of the statute Jennerson, the principal beneficiary, prepared or even caused to be prepared, this will? While the language of the statute is plain and unambiguous, yet it is not to be given an unwarranted and unreasonable construction, and we think the evidence here clearly shows that the will was written exactly as John had directed Jennerson to instruct Norris, the scrivener, and that within the contemplation of the statute it was not "written or prepared" by Jennerson. (*Anderson v. Anderson,* 147 Kan. 273-278, 76 P. 2d 825.)

From what has been said this phase of the case might well be brought to a close, but in view of the strenuous argument made by appellant we feel compelled to touch briefly on the question of the alleged confidential relationship existing between John and Jennerson over the period of years and particularly as of the time this will was executed. It is argued that because Jennerson came to live in the Schippel home when a small boy; had continued to work for John in a close relationship in the farming operations; that John had furnished him and his wife with a home there on the farm, and for many other reasons, he, within the contemplation of the statute, was the confidential agent of and occupied a position of confidence or trust to John. While undoubtedly a very close relationship did exist between the two men, we think appellant's deductions are not warranted by the evidence. In fact about the only incident in which it appears John was "dependent" upon Jennerson was to have the latter drive his car for him when he wanted to go in to town. The evidence is that John was a strong-willed individual, had a mind of his own, made his own decisions,

knew what was going on at all times, handled his own business affairs and that in a legal sense, and certainly within the contemplation of the statute, Jennerson merely was an employee and worked for him. The mere fact of such relationship, even over a period of years, did not create the position of confidence or trust urged by appellant. In the early case of *Sellards v. Kirby*, 82 Kan. 291, 108 Pac. 73, 20 Ann. Cas. 215, 28 L. R. A. (N. S.) 270, 136 Am. St. Rep. 110, it was said:

"The requirement that the testator must be shown to have had independent advice clearly implies that in order to be deemed to occupy a position of confidence or trust to the testator the draftsman must be someone to whom he naturally looks for counsel." (p. 297.)

(See, also, *Klose v. Collins*, 137 Kan. 321, 20 P. 2d 494, and *Jernberg v. Evangelical Lutheran Home for the Aged*, 156 Kan. 167, 131 P. 2d 691.) There is no evidence that John ever looked to or relied upon Jennerson for counsel or advice.

Under the evidence in this case we hold that Jennerson neither wrote or prepared the will, nor was he the confidential agent of or occupied a position of confidence or trust to John within the meaning of the statute. This being the case, the question of independent advice becomes immaterial. In *In re Estate of Horton*, 154 Kan. 269, 118 P. 2d 527, it was held:

"If, under the facts, it appears that the will was not prepared by the sole or principal beneficiary in such will who at the time of writing or preparing the will was the confidential agent or legal adviser of the testator or who occupied at that time any other position of confidence or trust to such testator, then we think the question of independent advice is immaterial." (p. 274.)

See, also, *Klose v. Collins*, supra, where it was said:

"The provisions of R. S. 22-214 with reference to having independent advice in the making of a will, which is later contested, are not applicable unless the will was written or prepared by the sole or principal beneficiary therein, who was at the time of its preparation the confidential agent or legal adviser of the testatrix." (Syl. ¶ 5.)

We think the finding of the lower court upholding the validity of the will in question was clearly correct.

This brings us to the question of the validity of the instrument heretofore referred to as an antenuptial contract and codicil to the will.

The gist of appellant's attack on this instrument is that her signature was obtained by fraud, deceit, and overreaching on the part of John; that she did not know her legal rights or the legal effect

of its provisions at the time she signed the instrument; that a full disclosure of all facts and circumstances was not made to her and that her so-called consent to the will in question is void and of no effect for those reasons.

Many cases dealing with antenuptial contracts are cited and discussed in the very excellent briefs filed by counsel for each party to this lawsiut. In some they were upheld, in others stricken down. The authorities disclose very little, if any, dispute as to the general rule covering the subject matter. The only difficulty lies in the application of the rule to the particular facts of a given case. In *In re Estate of Cantrell*, 154 Kan. 546, 119 P. 2d 483, in which the earlier decisions were reviewed, it was said:

"The general rule in this state is that contracts, made either before or after marriage, the purpose of which is to fix property rights between a husband and wife, are to be liberally interpretated to carry out the intentions of the makers, and to uphold such contracts where they are fairly and understandingly made, are just and equitable in their provisions and are not obtained by fraud or overreaching." (Syl. ¶ 1.)

"Where it appears that an antenuptial contract was understandingly made and freely executed, and where there is an absence of anything showing fraud or deceit, the mere fact the intended husband did not disclose in detail to the intended wife the nature, extent and value of his property will not, of itself, invalidate the contract or raise a presumption of fraudulent concealment, and if from a consideration of all the facts concerning the situation of the parties, such as their respective ages, family conditions, property rights, etc., at the time the contract was made the trial court concludes the intended wife was not overreached, the contract should be sustained." (Syl. ¶ 2.)

See, also, the recent case of *In Re Estate of Place*, 166 Kan. 528, 203 P. 2d 132, where it was held:

"The general rule is that where antenuptial contracts are fairly and understandingly made which are just and equitable in their provisions and free from fraud and deceit, they are valid and enforceable."

Tested by the foregoing, can it be said this contract was not fairly and understandingly made; that its provisions were not fair and equitable, and that it was the result of fraud, concealment and overreaching on the part of John? Our answer must be in the negative.

Despite Rose's belated denials and assertions, we must examine the evidence, both direct and circumstantial, realistically. The circumstances in connection with the signing of the contract in Norris' office have already been related. This is not a case of an elderly, experienced businessman entering into a marriage contract with an

inexperienced young woman. They were approximately the same age, lived within a few miles of each other and had known each other all of their lives. Their fathers had been long-time friends before them. Her own testimony shows that she knew in a general way what property John possessed. She knew he was a man of substantial means; that he had extensive farming interests and owned several city properties in Salina. While perhaps not well versed in the legal technicalities of wills, contracts and the like, yet she was an experienced businesswoman in her own right, and, to use her expression on cross-examination, had gone "through a pretty hard school of learning and experience." The evidence clearly establishes that she knew and understood she was signing a contract with reference to their property rights and that she understood the import thereof.

Was this contract fair and equitable in its provisions? In the absence of proof to the contrary, we can assume that in 1941 their respective holdings were, relatively speaking, the same as after John's death in 1948. On the latter date his estate was valued at $209,000. By the terms of the contract she took a life estate in this amount, and the evidence shows the income from it, figured on the basis of a landlord's share, to be approximately $6,000 per year. Her own property, worth about $24,000, produced an annual average income of $2,000. We fail to see where she was not thus adequately provided for during the remaining years of her life. Under the circumstances of this case, equity should not require of a man who marries late in life to make such financial provision for the wife of his declining years as will impair his existing obligations to those persons who have earned a right to share in his estate. We think the division thus made was fair and equitable.

And neither can we agree with her contention that the contract was the result of fraud, concealment or overreaching on the part of John. Other than her bare statements after John's lips were sealed by death, there simply is no evidence to sustain such argument. In fact, all of the other evidence, both direct and circumstantial, points directly to the opposite conclusion. In *Shriver v. Besse*, 163 Kan. 402, 183 P. 2d 407, it was held:

"Where a party voluntarily signs an antenuptial contract and thereafter seeks to refute it on the ground its execution was obtained by fraud, such fraud must be made to appear clearly before the contract may be declared invalid." (Syl. ¶ 3.)

On the general subject matter, see also *Hafer v. Hafer*, 33 Kan. 449, 6 Pac. 537; *Henry v. Butler*, 87 Kan. 122, 123 Pac. 742; *Watson v. Watson*, 104 Kan. 578, 180 Pac. 242, and *Hoard v. Jones*, 119 Kan. 138, 237 Pac. 888.

It is also argued that her so-called consent to John's will is ineffectual for the reason that the circumstances in connection therewith do not meet the requirements of valid consents to wills as laid down in our many decisions. What has been said with respect to the execution by her of the contract, taken as a whole, might well apply to this argument, but there is still another reason why her contentions with respect to the consent feature are without merit. When an antenuptial agreement is under attack the primary inquiry is whether the provision made for the prospective wife is reasonable and proportionate, free from fraud or overreaching, and whether it was understandingly and freely made. Such contracts are made when both parties are single and at a time when neither of them has any rights in the property of the other. They are made upon a different basis than consents by wives that the husband may will away more than one-half of his property. The consideration of such an agreement is the contemplated marriage, and the parties, for such consideration, simply agree in advance of marriage upon a different rule as to property rights than the statutory rule. The statute providing that a husband shall not will away more than one-half of his property without the written consent of his wife has no application here. By the very terms of this contract she limited herself to 'a life estate in his property and no consent to his will, as contemplated by the statutory provisions, was necessary.

In conclusion, we hold that the written instrument under date of July 10, 1939, is entitled to probate as and for the last will and testament of John E. Schippel, deceased, and further that the written instrument under date of February 21, 1941, is entitled to probate as and for a codicil and amendment to said will.

The judgment of the lower court is therefore in all respects affirmed.